### THE LIVINGSTONE.

(Circuit Court of Appeals, Second Circuit. April 21, 1904.)

#### No. 99.

1. MARINE INSURANCE—TOTAL LOSS—EFFECT OF ABANDONMENT.

Neither the abandonment to the insurer of a vessel sunk in collision nor a bill of sale conveying the same vests the insurer with a right of action against the vessel in fault for the collision, which can exist only on the principle of subrogation arising out of the performance of the insurance contract.

2. SAME—VALUED POLICY—SUBROGATION ON PAYMENT OF TOTAL LOSS.

Where a ship sunk by collision and abandoned to the insurer, being an actual total loss, is insured by a valued policy, and the stipulated sum is paid to the owner, who subsequently recovers her actual value, which exceeds her insurance value, as damages from the vessel responsible for the collision, the insurer is only entitled to be reimbursed from such recovery by receiving back the amount it has paid out, with interest, and the insured is entitled to the remainder in payment of his uncompensated loss.

Appeal from the District Court of the United States for the Western District of New York.

For opinion below, see 122 Fed. 278.

This is an appeal by the Lackawanna Transportation Company et al. from a decree of the District Court for the Western District of New York, entered May 2, 1903, adjudging that the World Marine Insurance Company, and other insurance companies, interveners, be paid the entire remnants and remainder

of the moneys in the registry of the court, after paying certain court charges, and that the said amount be divided among the said interveners, pro rata, according to the amounts of insurance written by them, respectively, on the steamer Grand Traverse, which was sunk in Lake Erie, after collision with the steamer Livingstone, October 19, 1896. The Livingstone [D. C.] 87 Fed. 769; on exceptions to commissioner's report, 104 Fed. 918; on appeal, 113 Fed. 879, 51 C. C. A. 560. The Livingstone having been held solely at fault for the loss of the Grand Traverse and the value of the latter having been fixed at $37,500 and interest, a decree against the Livingstone and her stipulator was entered for $59,311.70, with interest and costs. The greater part of this sum was distributed by agreement between the parties. There still remains in the registry of the court the sum of $12,500 and interest, which is in dispute in this controversy. The insurance companies claim this amount by reason of an abandonment of the Grand Traverse to them after the collision. The libelants claim the fund as owners of the Grand Traverse, insisting that they are entitled to the difference between the actual value of the lost vessel, $37,500, and the value fixed in the insurance policies, $25,000, and that the underwriters, having been reimbursed for the full amount paid by them upon said policies, are not entitled to the balance which was recovered by the diligence and perseverance of the owners. The facts now under review are carefully and correctly stated in the opinion of the District Judge in 122 Fed. 278.

John G. Milburn and Harvey D. Goulder, for appellants.
Wilhelmus Mynderse, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge (after stating the facts). The amount in controversy was recovered by the unaided efforts of the libelants against the active opposition of the interveners. The $25,000 paid by them to the libelants upon the policies of insurance, has been returned. The $12,500 in the registry of the court represents the difference between the value of the Grand Traverse as fixed in the policies and the value as fixed by the court, before the insurers became parties to this action. If paid to the interveners they will realize from the transaction a clear profit of $12,500 and the libelants a corresponding loss. If paid to the libelants they and the interveners will receive from the party responsible for the collision the exact amount of their respective losses.

The question briefly stated is as follows: Where a ship, sunk by collision and abandoned to the insurer, is insured by a valued policy for $25,000 and this sum is paid to her owner who subsequently recovers $37,500, her actual value, as damages, from the vessel responsible for the collision, is the insurer entitled to the entire recovery or only the $25,000 paid by him under the policy? Viewed as an original proposition, to be determined solely by the fundamental rules of equity, it would seem that but one answer is possible. How can the court make a more equitable disposition of the fund than by disbursing it so that the status quo before the collision is re-established? The insurer gets back the money he has paid under the policy, the owner gets back the value of his ship, both are made whole, and neither is permitted to profit at the expense of the other. Such a result would certainly see equitable, but it must, of course, be sustained by authority. In our system of jurisprudence principle is reached through precedent. The rights of the interveners rest either upon abandonment, bill of sale or subrogation, or all combined. On

December 31, 1896, the libelants abandoned the Grand Traverse to the underwriters in the following words:

"The company has decided to abandon the ship and hereby gives notice of such abandonment as provided in the policies."

On the 7th of January, 1897, the underwriters wrote as follows:

"We have your favor of the 31st ult. making abandonment of the steamer Grand Traverse, which we hereby accept. * * * If you will send us proofs of loss and policies, we will at once proceed with settlement of total loss."

On the 22d of January thereafter the owners of the Grand Traverse executed to the underwriters a bill of sale of the "said steamer or vessel, together with the masts, bowsprit, sails, boats, anchors, cables, tackle, furniture and all other necessaries thereunto appertaining and belonging."

There can be no question that these acts of the owners transferred to the underwriters the physical property and all the right, title and interest which the owners had therein. It is not easy, however, to understand how these transfers alone vested in the insurers the right to proceed against the vessel responsible for the collision or the right to appropriate the entire proceeds of a recovery in excess of the insurance. The conveyance of the res did not carry with it the right to proceed against the wrongdoer. That right had previously vested in the ship owners and, in the absence of express words of transfer, remained so vested.

The Grand Traverse was an actual total loss, "a mere congeries of planks," lying at the bottom of Lake Erie and worth no more than the bubbles that rose to the surface above the wreck. There was, in fact, nothing to abandon and nothing to sell. "If the loss be actually total, as there is nothing to abandon, an abandonment can have no effect whatever." Parsons on Marine Ins. vol. 2, p. 110; Hall & Long v. Railroad Co., 93 Wall. 367, 20 L. Ed. 594. The sale of the ship did not carry with it choses in action against those who had previously damaged the ship any more than the sale of a horse vests in the purchaser a right to prosecute one who before the sale had injured the horse; any more than the assignment of a patent carries with it a right to recover for past infringements. The thing abandoned and sold was the worthless wreck and not the right to recover $37,500 from those who had caused the wreck. In order, therefore, to ascertain the true character of the title of the insurers to the fund in court we must look beyond the mere abandonment and sale to the source of that title, namely, the contract of insurance and to the equitable principles brought into being by the action of the parties thereunder.

The valuation clause in question is in these words:

"And it is also agreed and declared that the subject matter of this Policy as between the Insured and the said Company as far as concerns this Policy shall be and is as follows upon Hull Materials &c. valued at £3,605
Machinery Boilers &c.    "    "    1,545 £5,150."

The valuation clause was originally adopted in marine policies to avoid the difficulty and sometimes the impossibility of ascertaining with precision the value of the property insured. As this was the first step

in the accurate measurement of the loss the insurer and insured agreed upon a value which, as between them, was to be taken as the basis of subsequent calculations. Why the agreement of the parties upon a convenient basis of calculation should operate to change the principle upon which the insurer had, theretofore, been reimbursed to the extent of his payment under the policy, it is not easy to understand. The reason of the rule is plain. A contract of insurance is one of indemnity. The premium is supposed to be a full consideration for the risk. Nevertheless, where the insurer has paid the entire amount of the loss he becomes subrogated, to the extent of his payment, to whatever interest the insured has in the property and to the latter's right to proceed against one who has negligently caused the loss.

The doctrine of subrogation has its origin in equity, its purpose is indemnity and its object is attained when the insurer has been fully compensated. The doctrine cannot be invoked to consummate injustice; it does not permit one party to secure an unfair advantage over the other; it does not permit the insurer to speculate, or profit or drive an unconscionable bargain. When he is ·paid in full equity requires the return of the balance to the insured in payment of his uncompensated loss.

In Memphis, etc., Railroad v. Dow, 120 U. S. 287, 301, 7 Sup. Ct. 482, 30 L. Ed. 595, the Supreme Court says:

"The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties. All that the appellees can, in good conscience, demand, is reimbursement for their outlay in protecting the mortgaged property against the prior lien of the state. When relief to that extent is accorded, they will have no just ground to complain."

Again, in the leading case of Liverpool Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469, 32 L. Ed. 788, the court say, at page 462, 129 U. S., page 479, 9 Sup. Ct., 32 L. Ed. 788:

"From the very nature of the contract of insurance as a contract of indemnity, the insurer, upon paying to the assured the amount of a loss, total or partial, of the goods insured, becomes, without any formal assignment, or any express stipulation to that effect in the policy, subrogated in a corresponding amount to the assured's right of action against the carrier or other person responsible for the loss; and in a court of admiralty may assert in his own name that right of the shipper. The Potomac, 105 U. S. 630, 634 [26 L. Ed. 1194]; Phœnix Ins. Co. v. Erie Transportation Co., 117 U. S. 312, 321 [6 Sup. Ct. 750, 29 L. Ed. 873]."

See, also, Norwich Ins. Soc. v. Standard Oil Co., 59 Fed. 984, 8 C. C. A. 433; Fairgrieve v. Marine Ins. Co., 94 Fed. 686, 37 C. C. A. 190; The St. Johns (D. C.) 101 Fed. 469, 474, 475; Arnould (7th Ed.) § 1227.

We conclude, therefore, that the insurance companies, having paid the full amount stipulated in the policies, are entitled to recoup that sum and that neither the abandonment nor the subrogation permits them to appropriate the balance recovered from the wrongdoer.

It is undoubtedly true that this ruling is not in accord with the English decision in the North of England Association v. Armstrong, L. R. 5 Q. B. 244. That decision carries no greater weight in this

country than is compelled by the force of its reasoning, and, after careful consideration, we are unconvinced by its logic and are unable to accept its conclusions. It proceeds upon what, to our minds, is an unnecessarily harsh and inequitable exposition of the rights of the insured, based upon the assumed change in the law produced by what the Chief Justice considered a "new-fangled form of insurance." That he doubted the equity of his conclusion may be inferred from the following excerpt from the opinion:

"Therefore, though it certainly startles one a little that the underwriters, who have only paid £6,000, the estimated value, as stated in the policy and agreed upon between the parties, shall, if the vessel should prove to be equal to that £6,000, or worth more, get all that can be recovered in respect of the loss of the vessel, yet still I think that is an incident which arises from this novel form of policy in which the value of the vessel is taken at a fixed sum as agreed upon between parties."

This decision has been questioned even in England, Lord Blackburn saying, in the House of Lords:

"I own that if I had a similar case to decide, sitting in the Court of Error, I should pause before I said that it was rightly decided." Burnand v. Rodocanachi, L. R. 7 App. Cas. 333.

It has never been followed in this country to the extent of sustaining the position taken by the appellees.

The case of Mobile & M. R. Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527, is cited in refutation of the foregoing statement. This case arose under a policy of fire insurance and turned largely upon a question of practice under the Alabama Code. The Armstrong Case is cited by way of illustration, but the point now under consideration did not arise and was not decided. The action was brought in the name of the shippers of the burned cotton and their right to recover the full value was sustained, the court observing:

"Although the suit is brought for the use of the insurer, and it is the sole party beneficially interested, yet its rights are to be worked out through the cause of action which the insured has against the common carrier. The legal title is in the insured, and the carrier is bound to respond for all the damages sustained by the breach of his contract. If only part of the loss has been paid by the insurer, the insured is entitled to the residue. How the money recovered is to be divided between the insured and the insurer is a question which interests them alone, and in which the common carrier is not concerned."

The case of Mason v. Marine Ins. Co., 110 Fed. 452, 49 C. C. A. 106, 54 L. R. A. 700, is also cited, but the question there determined was whether the underwriters, having paid the full amount of the insurance, $51,175, were entitled, after abandonment and conveyance to them of the ship, to a fund of $7,879 awarded for demurrage occurring after the collision. It was held that they were entitled to this sum, but it is not perceived how the decision bears upon the question now in controversy.

The contention that the appellees are entitled to some consideration because they had written policies upon the Livingstone by which they bound themselves to pay any loss for which she might become legally liable seems to us irrelevant to the present issue.

A distinction is pointed out between the language of the policy issued by the Reliance Company and that of the policies issued by the other

companies, but we think the question suggested is disposed of by what has been said already.

This is also true of the question of costs and expenses.

We are dealing with a case where, through the efforts of the owners of a wrecked vessel, damages in excess of her insured value have been recovered against those responsible for her loss. The insurers not only refused to participate in the litigation which produced this fund, but persistently and actively opposed it. They have been, or will be, completely indemnified for the loss sustained by them in paying the insurance, and they now seek to appropriate the remainder of the fund which is also claimed by those whose exertions brought it into court. The title of the insurers, by virtue of the valued policies, abandonment and conveyance, to the physical property and to salvage, may well be conceded, as may also their right to share in the recovery to the extent of full and complete reimbursement for all losses and expenditures made by them incident to the insurance. We are fully convinced that equity and good conscience do not require the court to go further and permit them to realize an enormous profit from the transaction. No controlling authority compels such a decision; no principle of equity requires it. By limiting the recovery within the bounds of indemnity we are on safe and logical ground, where exact justice is done to both parties and where injustice to either is impossible.

The decree is reversed with costs of this appeal and the case is remanded to the District Court with instructions to enter a decree awarding the appellees interest on the sums paid by them during the time they were deprived of the use of said sums, and awarding the balance of the fund in court, after paying court fees and charges, to the libelants.