### AETNA INS. CO. v. UNITED FRUIT CO.

### UNION MARINE & GENERAL INS. CO., Limited, v. SAME.

### BOSTON INS. CO. v. SAME.

#### Nos. 50–52.

Circuit Court of Appeals, Second Circuit.

Nov. 8, 1937.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar and Martin Detels, both of New York City, of counsel), for plaintiffs.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Cletus Keating and Richard Sullivan, both of New York City, of counsel), for defendant.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The three actions here on appeal were brought by separate underwriters to recover money received by the insured in payment of a judgment recovered by it in a suit against the United States; they are based upon the theory that the payment was in the nature of salvage, and was for the account of both underwriters and owner. The question is on what principle it should be divided. The facts are as follows. In 1918 the three plaintiffs, with a number of other underwriters, issued "valued hull" policies upon the defendant's ship, "Almirante"; the agreed value was $632,610—known at the time to be far less than the actual value of the ship;—the total insurance was $582,002.25, divided about equally between American and English insurers. Thus the defendant was a coinsurer for about $50,000, and was in addition undercovered in the event of a total loss. To protect itself against the second risk, it took out additional English hull insurance, "P. P. I." (Policy Proof of Interest) amounting to $141,614, and other English "P. P. I." policies not strictly hull insurance, but upon losses incidental to the total loss of the ship. All these "P. P. I." policies created no obligation; they were "honor" policies, payable only at the pleasure of the insurer, and they expressly surrendered all rights of subrogation. On Sept. 19, 1918, the "Almirante" was sunk and became a total loss as the result of a

collision with the S. S. "Hisko," a vessel owned by the United States. The hull underwriters paid the full amount of their coverage to the defendant, and so did the "P. P. I." underwriters. Thereupon both the defendant and the hull underwriters joined in retaining attorneys to pursue the United States for the fault of the "Hisko." They secured the passage of a special act of Congress authorizing a suit, which finally resulted in a judgment for $1,761,693.02, made up of the true value of the "Almirante," $1,750,000, and of her equipment, supplies and the like, $11,693.-02. This judgment was paid on July 26, 1932, and the defendant undertook to make distribution of the proceeds. To that end it engaged the well known marine insurance agents, Johnson & Higgins, who prepared a "recovery statement," in which they apportioned the expenses (for the most part the fees of attorneys) between the defendant and the hull underwriters in the proportion of four to one, and allotted to the hull underwriters their original payments less their share of the expenses, but without interest, for the defendant had recovered no interest against the United States. This adjustment the English underwriters accepted, but the Americans protested; first, because they should not have been compelled to bear any part of the expenses of the recovery; and second, because, although they had paid the defendant in 1918, they received no interest for the delay, except what the money had earned after the defendant collected the judgment. Further, though not pressing the point in this court, they reserved against a possible appeal to the Supreme Court a claim to the whole recovery. The judge felt himself bound by The Livingstone. 130 F. 746 (C.C.A.2), not to deduct from the plaintiff's recovery any part of the expenses of the suit against the United States, but he thought that the principle of that decision did not extend to the allowance of interest when none had been recovered. Our decision must depend upon the effect to be given to the agreed value in a "valued hull policy." On the one hand the provision might be understood as meaning that in all future relations between owner and underwriter, however arising, the stipulated amount must be taken as the actual value of the ship; on the other hand it might be understood as meaning only that the underwriters should not be called upon to pay more than the agreed amount, and that they should not be free to assert that the vessel was worth less, when sued upon their policies. Some courts have taken the first view as to the hull policies, though none have ever done so either as to cargo policies, or in any but marine insurance.

The plaintiffs admit as much, and stand upon the doctrine as an exception so well established as to be implied in the terms of all hull policies; in addition they defend it in principle. They argue that since the hull underwriter of a "valued" policy must pay all partial losses in full, unlike any other insurer (International Navigation Co. v. Atlantic Mutual Ins. Co. [D. C.] 100 F. 304, 318; Id., 108 F. 987 [C.C. A.2]; Aitcheson v. Lohre, L.R. 4 App.Cas. 755), he ought not to be obliged to let in the owner as a coïnsurer when there is a total loss. It is true that the rule has become settled in cases of "valued" hull policies that the underwriter pays partial losses in full, and it is also true that consistently with the principles of other insurance he ought not to be so charged. However, the reason is not that the agreed value is taken as an estoppel, but that partial losses in the case of hulls commonly result in repairs, the injured hull not being appraised like cargo. Gulf Refining Co. v. Atlantic Mutual Ins. Co., 279 U.S. 708, 713, 49 S.Ct. 439, 73 L.Ed. 914. That this is the real explanation is confirmed by the fact that the rule is not applied even in hull cases when the claim does not result from repairs. Pitman v. Universal Marine Co., L.R. 9 Q.B.D. 192; S. S. "Balmoral" Company v. Marten (1902) App. Cas. 511. The argument does not therefore seem to us convincing. The plaintiffs next argue that when the owner has covered his excess value with "P. P. I." policies not entitled to subrogation, it would be unjust to the hull underwriters if he is allowed to share with them any recovery against tort-feasors. He should not be treated as a coïnsurer as to the excess value in dividing that recovery if he has been indemnified pro tanto by "P. P. I." payments. Indeed, it may well be that such payments should be bought into hotchpot in ascertaining the total amount recovered, and if they and the recovery together cover the loss, the hull underwriters will recoup in full; but if there be a rump left over, they should have no claim upon that; the venture was not theirs and the owner has merely had a windfall, owing to the peculiar nature of the "P. P.

I." policies. Finally we are not convinced by the argument of Brown, J. in The St. Johns (D.C.) 101 F. 469, 473, that since in cases of full insurance the hull underwriter is wholly indemnified, the owner should not complain of the same result when he chooses to undervalue his ship and so to save premiums. That reasoning might indeed prevail in cases where the underwriter had been led to suppose that the agreed value was the full value, but that is never the case; at least it was not the case here. When it is not, there can be no inequity in letting in the owner as coinsurer, unless a contrary stipulation is to be implied in the policy; for the underlying understanding in any sort of insurance is that the insured is to be made whole at the insurer's expense; not that the insurer is to be preferred.

█ As to the authorities, North of England Association v. Armstrong, L.R. 5 Q.B. 244 (1870), supports the plaintiffs; supports them even in their claim to the whole recovery, though that point was not actually decided. It held flatly that the agreed value was an estoppel between the parties whenever value became relevant in their legal relations. That result was thought to follow upon the privilege of an underwriter, who has paid a total loss, to take over the wreck, to raise and repair it, and to make such profit from it as he can. Recovery against a tort-feasor stands precisely like the wreck, the court said; it is a substitute for the ship and the underwriter is as much entitled to it. This argument seems to us fallacious. In the first place, the owner often in fact abandons the wreck, though the underwriter's privilege does not in law depend upon it; and so far as we are advised, no case has arisen in which an underwriter has actually profited out of the wreck, when the owner did not abandon. But assuming that in such a case he might retain any profit, that is irrelevant here. An owner who receives payment of a total loss and who, even though he does not expressly abandon the wreck, allows the underwriter at his own cost to raise and restore it, may well have no equitable claim to any resulting profit. But an owner who, not being covered by his hull insurance, actively prosecutes a right of action against a tort-feasor—especially when, as here, he does it in conjunction with his underwriter—shows as plainly as possible that he means to assert an interest in it, which would be grossly unjust to give to the underwriter after the owner has won. Yet, unless one is prepared to go so far as this, the reasoning of North of England Association v. Armstrong, supra (L.R. 5 Q.B. 244), will not serve, for there is no antecedent ground for saying that the agreed value must be an estoppel for all purposes. Lord Blackburn in Burnand v. Rodocanachi, L.R. 7 App.Cas. 333, 342, plainly disapproved the decision, and although Scrutton, J. felt bound to follow it in Thames & Mersey Maine Ins. Co. v. British & Chilean S. S. Co., (1915) L.R. 2 K.B. 214, he too appears to have had doubts as to its correctness (p. 221). On the other hand, Brown, J. in The St. Johns, supra (D.C.) 101 F. 469, not only followed it, though in a case where the underwriter made no actual profit, but was merely preferred to the owner, but justified it for the reasons we have already stated. In The Livingstone, supra, 130 F. 746, we were presented with a claim for the whole recovery against a tort-feasor. It was a legitimate corollary upon North of England Association v. Armstrong, supra (L. R. 5 Q.B. 244), inescapable if the ratio decidendi of that decision was recognized at all, for the mid ground which the plaintiffs suggest—that the underwriter should be merely preferred to the owner—has no warrant in law. Unless his right of subrogation gives him the recovery in toto, he must let in the owner as coinsurer, as in other similar situations. We refused to recognize the reasoning of that decision; we refused to let the underwriter profit out of the venture. We said nothing more; we did not put him in a preferred position for it was not necessary; the language relied upon to that effect on page 751 of 130 F., was certainly not uttered with any such intent. Nevertheless, although the point was not discussed and probably was not considered originally, it is true that the mandate was so drawn as to repay to the underwriters their full payments without deducting anything for expenses. Moreover, when this was called to our attention upon petition of rehearing, we refused to amend the mandate. For this reason the plaintiffs say that we accepted the general principle of North of England Association v. Armstrong, supra (L.R. 5 Q.B. 244), and that we only limited it by denying any profit to the underwriter. We are unwilling to accept a

decision upon a point not discussed in the opinion and of relatively small consequence anyway, as having the full force of a precedent, especially when to do so is to compromise the only theory on which the decision in chief could rest. It is scarcely necessary more than to allude to the kind of approval supposed to have been given to North of England Association v. Armstrong, supra (L.R. 5 Q.B. 244) in the Potomac, 105 U.S. 630, 635, 26 L.Ed. 1194.

 There remains, however, the question whether, regardless of how we should decide the point were it before us for the first time, we should assume that the rule was written into the policies sub silentio as part of the settled law. Whatever be the case in England, there is no ground for supposing it settled here. The St. Johns, supra (D.C.) 101 F. 469, was indeed cited in The Livingstone, supra (C.C.A.) 130 F. 746, though it is not clear for what purpose; but its reasoning was necessarily overruled, and although unquestionably it has the great authority of the judge who decided it, we cannot regard it as unimpaired. We do not forget that we are not to depart from English maritime law, when we can help it (The Eliza Lines, 199 U.S. 119, 128, 26 S.Ct. 8, 50 L.Ed. 115, 4 Ann.Cas. 406; Queen Ins. Co. v. Globe & R. F. Ins. Co., 263 U.S. 487, 493, 44 S.Ct. 175, 68 L.Ed. 402), but North of England Association v. Armstrong, supra (L.R. 5 Q.B. 244), has never been passed on by an appellate court, was questioned by a great judge, and followed by another with doubt and because he was bound by its authority. All this does not in our opinion make up such a uniform body of authority that we must assume the doctrine as an implied term in American hull policies. Besides, although we are not advised of the circumstances in which the "recovery statement" was made, we do know that it was prepared by persons especially versed in such questions, and they at any rate followed the orthodox rule.

No question has been raised in the briefs as to the correctness of the "statement," in case the defendant is to be regarded as coinsurer to the extent of the actual value, as opposed to the agreed. Moreover, the plaintiffs' assignments of errors claim specifically only that they should have had all the recovery, or at least interest upon their payments; otherwise they only assign generally that the decision was wrong. Therefore, no other questions can be raised; and indeed, as we have just said, we do not understand that any others are intended to be raised.

Judgment affirmed in the plaintiffs' appeals and reversed on the defendant's appeal; complaints dismissed.