QUEEN INSURANCE COMPANY OF AMERICA *v.* GLOBE & RUTGERS FIRE INSURANCE COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 116. Argued December 6, 1923.—Decided January 7, 1924.

1. Clauses in a marine insurance policy excepting, " all consequences of hostilities or warlike operations," and in a war risk insurance policy insuring against acts " authorized by and in prosecution of hostilities," should be construed narrowly as applicable only where warlike acts or operations are the proximate cause of a loss. P. 492.

2. There are special reasons for construing such policies in harmony with the marine insurance law of England. P. 493.

3. Where the cargo lost was all contraband, shipped in an Italian steamship from this country to Italy during the late war, and consisted in part of supplies and munitions for the Italian Government, and where the loss occurred while the vessel was in a convoy sailing with screened lights, protected by British, Italian and American war vessels and subject to the command of a naval officer, and resulted from a collision with a British steamship in another convoy similarly commanded which met the first one in the dark,—*held*, that the loss was not attributable to warlike operations, within the meaning of the above exception. P. 491.

282 Fed. 976, affirmed.

CERTIORARI to a decree of the Circuit Court of Appeals affirming a decree of the District Court which dismissed a libel upon an insurance policy.

*Mr. Oscar R. Houston,* with whom *Mr. D. Roger Englar* and *Mr. George S. Brengle* were on the brief, for petitioner.

I. The loss was a proximate result of " acts of kings in prosecution of hostilities."

The lower courts reached their conclusions, not on principle, but out of deference to the decision of the House of Lords in the cases of *The Matiana* (1921) 1 A. C. 99; s. c. (1919) 1 K. B. 632; (1919) 2 K. B. 670; and *The Petersham* (1921) 1 A. C. 99; s. c. (1919) 1 K. B. 575. [Discussing also *The St. Oswald* (1918) 2 K. B. 879; *The Ardgantock* and *The Richard de Larrinaga* (1921) 2 A. C. 141; s. c. (1920) 1 K. B. 705; *The Bonvilston* and *Geelong* (1923) A. C. 191; *The Warilda* (1923) A. C. 292.]

Under these decisions, if two ships (whether privately operated or under requisition) traveling at night at full speed, without lights, in accordance with Admiralty instructions, come into collision, without either being at fault, then, if both are carrying commercial cargoes, the loss falls upon marine underwriters, *The Petersham, supra;* but if either is carrying government stores to a war base,

the loss falls upon war risk underwriters, even though the character of the cargo in no way affects the navigation of the vessels. *The Bonvilston, supra.* If a merchant ship carrying a commercial cargo comes into collision with a warship, then, if both ships are at fault, or if neither is at fault, or if the warship alone is at fault, the loss falls upon war risk underwriters, *The Ardgantock* and *The Warilda, supra;* even though the warship is not actually performing any naval duty but is merely proceeding to some port where she intends to take up naval operations. *The Richard de Larrinaga, supra.* But if the merchant ship alone is negligent, the loss falls on marine underwriters. *Charente S. S. Co.* v. *Director of Transports,* 38 T. L. R. 148.

The above distinctions disregard the real substance of the issues. The intent of all parties is that marine underwriters during war shall continue to bear the same risks they bore in times of peace, and that new risks brought about by war are specially insured at a higher premium. This intent is wholly defeated by making the character of the cargo of either vessel determine upon which set of underwriters the loss will fall, or by treating a collision with escorting warships as falling upon a different set of underwriters from a collision with one of the escorted ships. The proper test is to look at the efficient, dominating, or proximate cause. Was the collision the result of the ordinary causes of collision, such as faulty navigation, fog, neglect of sailing rules, etc., or was it the result of the act of the naval authorities in sending two fleets of ships, in close formation, showing no lights, on courses which met, without warning either fleet of the impending approach of the other? See (1921) 1 A. C. 135. The naval authorities by their handling of the convoys created a new risk, as part of the general plan for prosecuting hostilities, and it was this new risk that was the proximate cause of the collision. Cf. *The Canadia,* 246 Fed. 759; *The Llama,* 291 Fed. 1.

II. Merchant ships sailing in convoy are engaged in a warlike operation, under American law. *The Atalanta,* 3 Wheat. 409; *The Nereide,* 9 Cr. 388; *The Ship Galen,* 37 Ct. Clms. 89; *The Schooner Nancy,* 27 Ct. Clms. 99; *The Black Sea Nymph,* 36 Ct. Clms. 369; Woolsey, Int. Law, 4th ed., § 193; 1 Kent Com., 4th ed., § 155; 7 Moore, Int. Law Dig., p. 494.

III. There is no commercial necessity requiring the American courts to follow the British decisions.

*Mr. Van Vechten Veeder,* with whom *Mr. Charles C. Burlingham* was on the brief, for respondent.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a libel in admiralty upon a New York policy insuring cargo on the Italian steamship Napoli lost by collision in the Mediterranean, in or near the Gulf of Lyons, on July 4, 1918. The libellant also in New York had insured the cargo concerned against marine risks and the libellee had insured it against war risks. Each company by agreement paid half the loss subject to adjustment and took an assignment of the claim of the assured against the other. The main question in the case is whether the loss was covered by the libellee's policy as the libellant contends. We were asked to assume that the exception of " all consequences . . . of hostilities or warlike operations " in the marine policy and the liability for " acts of kings, princes and people authorized by and in prosecution of hostilities between belligerent nations " assumed by the libellee were coextensive. For the purposes of argument we shall do so. The Courts below in deference to the English decisions held that the loss could not be attributed to warlike operations. There was a difference of opinion as to whether the collision was due to faulty navigation, but all the judges agreed that it was expedient to follow the English law. 278 Fed. 770. 282 Fed. 976.

It will not be necessary to state the facts in detail. They are fully set forth in the decisions below but those that are material to our conclusion need but a few words. The Napoli sailed from New York for Genoa with a cargo of which a part was intended for the Italian Government and a small part was munitions of war. All of it was contraband. At Gibraltar she joined a convoy, as it was practically necessary to do although not ordered by the military powers. The convoy sailed with screened lights, protected by British, Italian and American war vessels, and navigated by an Italian commander on the Napoli, subject to the command of a British captain as the senior naval officer present. The route to be followed was ordered beforehand up to a point where instructions from Genoa were to be received but were not, as the convoy was ahead of the scheduled time. At about midnight July 4 another convoy similarly commanded met this one head on. It was seen only a very few minutes before the meeting, there was much confusion, and one of its vessels, the Lamington, a British steamship, struck the Napoli and sank her. As our judgment is based on broader grounds, we do not describe the movements bearing upon the nice question whether the navigation of the Napoli or the Lamington was in fault.

To show that the loss is to be attributed to warlike operations, the petitioner points to sailing under convoy and without lights, both made necessary by the war, as enough. To this it adds that the cargo of the Napoli was an aid in carrying on the struggle, a matter of special importance in the late war, where the issue depended so largely on supplies, where, as it was put by Hough, J., below, " commerce existed only as an adjunct to war "; that the routes and particulars of navigation were determined by naval command; and that the naval authorities were responsible for the meeting of the two convoys without previous notice. It urges with plausibility that the

collision would not have happened but for the proceed-
ings thus prescribed as an essential part of the conduct of
the war.    As corroborating its large interpretation of
" consequences of hostilities or warlike operations " it
states that, while the premiums upon war risk insurance
were greatly increased, those upon marine risks underwent
but little change.

On the other hand the common understanding is that in
construing these policies we are not to take broad views
but generally are to stop our inquiries with the cause
nearest to the loss.    This is a settled rule of construction,
and, if it is understood, does not deserve much criticism,
since theoretically at least the parties can shape their con-
tract as they like.    *Morgan* v. *United States,* 14 Wall.
531, applied this rule beyond the limits of insurance to a
charter party made during the Civil War, by which the
United States assumed the war risks and the owners were
to bear the marine risks.    The boat carrying troops and
stores was compelled to put to sea by the orders of a quar-
termaster given to meet what he thought the exigency of
the service, although the danger was obvious and the
master and pilot advised against it.    This Court recog-
nized the hardship of the owners' case, in view of the per-
emptory order to proceed to sea, but declined to look be-
yond the wind and waves that were the immediate cause
of the loss.    A similar decision was reached by the House
of Lords after the late war in a case where the chartered
vessel, the Petersham, was sailing without lights because
of Admiralty regulations and collided with a Spanish
vessel also without lights, and it was found that because
of the absence of lights the collision could not have been
avoided by reasonable care.    *Britain Steamship Co.* v.
*The King,* [1921], 1 A. C. 99; affirming the decision of the
Court of Appeal, [1919], 2 K. B. 670.    See *Morgan* v.
*United States,* 5 Ct. Clms. 182, 194; *Reybold* v. *United
States,* 5 Ct. Clms. 277, 283, 284.

 The same principle was applied to insurance, the special field of this narrow construction, in the case of the Matiana heard and decided with the Petersham, where a vessel was sailing under convoy and struck a reef without negligence on the part of the master or the naval officer in command of the escort.  The discussion turned largely on the question whether the remoter causes of the collision and stranding were warlike operations, and from the tenor of the arguments on the one side and the other it may be doubted whether *Morgan* v. *United States* would not have been thought to go too far.  But the Matiana certainly goes as far as the decision below in this case.  There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business, and as we could not reverse the decision below without overruling *Morgan* v. *United States,* we are of opinion that the decree of the Circuit Court of Appeals must be affirmed.  We repeat that we are dealing not with general principles but only with the construction of an ancient form of words which always have been taken in a narrow sense, and in *Morgan* v. *United States* were construed to refer only to the nearest cause of loss even when there were strong grounds for looking beyond it to military command.

*Decree affirmed.*