## LINK et al. v. GENERAL INS. CO. OF AMERICA.

### No. 14378.

District Court, W. D. Washington, N. D.

May 31, 1944.

Bogle, Bogle & Gates, Stanley B. Long, and Thomas L. Morrow, all of Seattle, Wash., for libelants.

Skeel, McKelvy, Henke, Evanson & Uhlmann, of Seattle, Wash., for respondent.

BOWEN, District Judge.

The respondent's .exception to the sufficiency of the amended libel raises for decision the sole question whether the damage to their vessel sustained by libelants as the result of a collision between their vessel "Eastern Prince" and the "U. S. S. Roustabout," a Navy tanker, was a "consequence of war like operations" of either vessel and particularly of the Navy tanker. The insurance policy on which libelants sue insures against such a war risk.

Here upon such exception we accept as true the facts alleged in the amended libel that the Navy tanker, officered, manned and operated by the Navy, was proceeding between West Coast and Alaska war bases with a cargo of fuel oil, gasoline and other petroleum products for use by combatant Naval vessels and aircraft of the United States in the prosecution of the present war with Japan.

A leading Supreme Court decision bearing on the question is the case of Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 44 S.Ct. 175, 176, 68 L.Ed. 402, where Justice Holmes, speaking for that Court, held that in cases like this involving war risk liability courts should look only to the cause nearest the injury in determining such liability, but the further ruling of the lower federal courts in that case that English court decisions should be followed by American courts in such determination was also approved by Justice Holmes.

That case involved a collision in war time between the "Napoli" and the "Lamington," two merchant vessels in separate convoys protected by war vessels and proceeding with screened lights under naval command in opposite directions. The collision beteween those two vessels resulted from the unexpected head-on meeting of the two convoys due to non-receipt of expected orders for a change in the previously ordered sailing route of the eastbound convoy containing the "Napoli," such change orders not being received because that convoy was ahead of schedule. The "Napoli" with her contraband cargo, a small part of which was war munitions, was sunk by the collision and her cargo's marine risk underwriter, as assignee of the cargo owner, sued the war risk underwriter, contending the loss resulted from warlike operations. The court refused recovery, holding the loss was not a consequence of warlike operations, in effect because the collision was not caused by any immediate military maneuver or operational war danger.

Respondent relies upon that conclusion and reason as the correct principle to be applied to the case at bar. Libellants, however, contend that both vessels here were in the sense of the war risk insurance clause engaged in a warlike operation.

In approving the policy of applying in American courts the English court decisions, Justice Holmes, for the Supreme Court in the Queen Ins. case, finally gave effect to the conclusion of expediency, reached reluctantly by Judge Hough of the District Court and affirmed by the Second Circuit Court of Appeals, that the best interests of all concerned in the war risk phase of the world wide marine insurance field require that American courts follow English court decisions because, as Justice Holmes said: "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business * * *." Approval of that policy has been in varying form stated also in the following federal court cases: Mellon v. Federal Ins. Co., D.C., 14 F.2d 997, 1004; New York & Oriental S. S. Co. v. Automobile Ins. Co., 2 Cir., 37 F.2d 461, 463; Ætna Ins. Co. v. Houston Oil & Transport Co., 5 Cir., 49 F.2d 121, 124; The Galileo, 2 Cir., 54 F.2d 913, 915; Ætna Ins. Co. v. United Fruit Co., 304 U.S. 430, 438, 58 S.Ct. 959, 82 L.Ed. 1443.

Thus the Queen Ins. Co. case teaches that, in deciding whether a marine loss is covered by a war risk insurance clause, two principles are to be considered. One is that we "generally are to stop our inquiries with the cause nearest to the loss." The other is that for expediency and harmony in the marine insurance world the American courts should follow the English court decisions. The Queen Ins. case did not say which one of those principles is paramount in case of conflict between them, probably because it does not appear such a conflict existed in that case.

It seems clear, however, that the requirement to follow English court decisions is a more specific and less variable criterion than that of stopping at the cause nearest to the loss, because if there is an authoritative English decision on the facts of the case in question that decision concludes the matter, whereas stopping at the cause nearest to the loss may and usually does reasonably involve the further debatable question of what is or what is meant by the nearest cause of loss.

So if on the facts involved here there are English court decisions clearly applicable, no good purpose would be served by extending discussion beyond a brief statement of the essential facts and rulings of the cited cases followed by the court's conclusions as to their application to the case at bar.

The Geelong case, [1923] A.C. 191, involved a collision between the "Geelong" and the "Bonvilston." The "Geelong," chartered by the Australian government, was carrying a cargo of normal commercial merchandise. The "Bonvilston," a British merchant ship, was carrying military stores such as ambulance wagons and similar military equipment between British war bases. The English court held that the loss occasioned by that collision was the result of warlike operations within the war risk clause.

The Ardgantock case, [1921] 2 A. C. 141, involved a collision between the "Ardgantock," a merchant vessel, and the British destroyer "Tartar" which was on patrol duty. The collision was caused by the "Tartar's" turning maneuver at the end of her patrol beat. The English court held the loss resulting from this collision was a consequence of warlike operations.

The Trevanion-The Roanoke case, [1929] A. C. 534, involved a collision between the

"Trevanion," a British merchant ship, and the "Roanoke," a United States mine planter, while the "Roanoke" was, shortly after the Armistice in the last war, returning to the United States with a load of mines. The English Court emphasized the fact that the time of the collision was during an armistice and not after termination of the war, and held that the "Roanoke" was serving as a navy vessel in active war service and that the loss was the result of warlike operations.

In the Coxwold case, The Times Law Reports, June 5, 1942, page 263, where a convoyed vessel carrying military supplies (petrol) from one British war base to another stranded as a result of an unexpected and unexplained tidal set while trying to make a specific course set by naval orders, Lord Porter, of the English House of Lords, summarized the applicable principle as developed by English court decisions as follows:

"* * * (5) A ship carrying war stores from one war base to another is engaged in a warlike operation. The Geelong (39 The Times L.R. 133; [1923] A.C. 191). (6) A collision caused by a ship so engaged is caused by the warlike operation. Attorney-General v. Ard Coasters (37 The Times L.R. 692; [1921] 2 A.C. 141. * * *

"* * * Stranding, it is true, is normally a marine risk just as a collision is, but it may nevertheless be effectively caused by a warlike operation where that operation is the proceeding from one war base to another and the stranding takes place as a result of so proceeding."

Lord Wright in the same case said:

"* * * The warlike operation was, as it were, an umbrella which covered every active step taken to carry it out, including the navigation, the course and helm action intended to bring the vessel to the position required by the warlike operation, and that none the less because accident or mischance or negligence lead to stranding or collision. * * *"

Lord Atkin in the Coxwold case, supra, stated:

"* * * Rightly or wrongly nearly every question that can arise on the controversy between marine and war risk has been settled to the great convenience of the shipping world, if not with the approval of all their advisers. If the warlike operation includes the direction of the war vessel through the water from one war starting point to another war destination it seems to remain true that almost every casualty to a ship during such an operation will be the consequence of a war operation. * *"

In the Geelong-Bonvilston case, supra, the English court said:

"* * * Probably the phrase (warlike operation) includes all those operations of a belligerent power or its agents which form part of or directly lead up to those processes of attack and defence which are of the essence of war. * * *

"* * * the carriage in time of war of ambulance wagons and other Government stores from one war base to another war base is carriage for the purpose of the war. * * *"

Other English cases and the very able arguments and exhaustive briefs of counsel on both sides have been carefully considered, but the court believes the facts of the above cited English cases are more nearly like the facts in this case than are the facts of any other cases called to the court's attention.

■■■ In the case at bar, the "Roustabout," a duly commissioned naval vessel of the United States, employed solely for naval tanker purposes, officered and manned by naval officers and crew and operated by the Navy, collided with and damaged libelants' vessel while the "Roustabout" was proceeding from a West Coast war base to another war base in Alaska with a cargo of fuel oil, gasoline and other petroleum products for use by combatant naval vessels and aircraft of the United States in the present war with Japan. In view of those facts and of the English court decision in the similar Ardgantock case, supra, and the other English decisions above cited, and because the "Roustabout" was a war vessel on active Navy duty as was the case in the "Roanoke," supra, this court is of the opinion and decides that the damage sustained by libelants as a result of the "Roustabout's" collision with and damaging libelants' vessel was a consequence of the "Roustabout's" warlike operations, and that for such damage respondent is liable under the war risk clause of the policy of insurance herein sued upon. The amended libel, therefore, does sufficiently state a cause of action, and respondent's exception to the amended libel will be overruled.

The foregoing renders unnecessary a decision upon the question whether the libelants' vessel was herself, as contended by libelants, engaged in a warlike operation.

An order may be settled upon notice or stipulation.