## BAKER CASTOR OIL CO. v. INSURANCE CO. OF NORTH AMERICA.

District Court, S. D. New York.

Dec. 30, 1944.

Forrest E. Single, of New York City, for plaintiff.

Bigham, Englar, Jones & Houston, of New York City (Martin Detels and Charles W. Harvey, both of New York City, of counsel), for defendant.

GODDARD, District Judge.

This is a suit by the plaintiff, a cargo owner, against the defendant, a cargo underwriter, to recover freight charges of $39,249.58 paid by plaintiff for transportation by railroad to Bayonne, New Jersey, of cargo discharged at New Orleans from three Brazilian vessels. The cargo consisted of 44,967 bags of castor beans loaded at various ports in Brazil aboard the vessels Commandante Pessoa, Lesteloide and Jaboatao in February, March and May, 1942, for carriage to New York Harbor; 9,405 bags on the Commandante Pessoa, 33,868 bags on the Lesteloide, and 1,694 bags on the Jaboatao. The several bills of lading named New York as the port to which the shipments were to be carried by the three vessels.

The defendant insured plaintiff under two open policies; One against marine risks which covered the castor beans from the shipper's warehouse in Brazil to de-

fendant's warehouse in Bayonne; the other policy insured against war risks which covered only while cargo was aboard the overseas vessels from the port of loading in Brazil to the port of discharge in the United States. The marine policy and the war risk policy, although separate contracts, are issued together and reference must be made to the marine policy to ascertain general items which apply to both, such as description and value of the insured merchandise, the sum insured, the voyage, the carrying vessel and certain other elements of the insurance. The suit is upon the war risk policy, and the pertinent coverage clause is as follows:

"I. This insurance is only against the risks of capture, seizure, destruction or damage by men of war, piracy, takings at sea, arrests, restraints and detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, and including the risks of aerial bombardment, floating or stationary mines and stray or derelict torpedoes; but excluding claims for delay, deterioration and/or loss of market, and warranted not to abandon [on any ground other than physical damage to ship or cargo] until after condemnation of the property insured. Also warranted not to abandon in case of blockade, and free from any claims for loss or expense in consequence of blockade or of any attempt to evade blockade; but in the event of blockade, to be at liberty to proceed to an open port and there end the voyage."

The original complaint alleged:

"Eighth: That the aforesaid voyages of these vessels from Brazil to New York, due to the activity of German submarines off the coast of the United States, was interrupted, and the said vessels were ordered by the United States Government to proceed to the port of New Orleans for the purpose of protecting the aforesaid vessels and their cargoes from the danger of enemy action."

Upon trial the complaint was amended by adding—

"Eighth (a): That during the aforesaid voyage from Brazil to New York, the Government of Brazil, because of submarine activity on the route to destination, ordered these vessels into ports of refuge where they remained until satisfactory arrangements for protection en route to the United States had been made, and that the said vessels then proceeded but discharged their cargoes at the port of New Orleans instead of at the originally intended destination of the vessels at New York. The United States of Brazil at said time was a neutral in World War No. 2."

The complaint, as amended, alleges that the three vessels previously referred to, were ordered to proceed to New Orleans, both by the Brazilian Government and by the United States Government.

The defendant's answer, besides raising the general issue as to whether plaintiff sustained any loss by any peril insured against, alleges the three following affirmative defenses:

First: That the policy provides for the termination of the war risk insurance as soon as the merchandise is "discharged overside from an overseas vessel at the final port of discharge," and also that where, in the exercise of any liberty granted to the shipowner under the contract of affreightment, that contract is terminated at a port other than destination named in the bill of lading, such port "shall be deemed the final port of discharge." It then alleges that the Brazilian Government, which owned the three vessels, terminated the voyages at New Orleans in the exercise of liberties granted to it under the bills of lading, thereby substituting New Orleans as the port of discharge where the war risk insurance terminated.

Second: Sets up the frustration clause (No. 2) of the policy which excludes "any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints, or detainments," and alleges that if the Government of the United States ordered these vessels not to go to New York, the voyages were frustrated by restraints, and as the claim for rail freight from New Orleans to New York was based upon such frustration of the voyage to New York, it was barred by the frustration clause.

Third: That if the vessels were ordered by the United States Government to go to New Orleans instead of to New York, the orders were given while the vessels were moored in Brazilian ports and the

losses claimed resulted from restraints by the United States Government for which defendant is not liable.

Simply stated the claim of the plaintiff is that there was a "restraint" by the Brazilian Government and/or by the United States Government, and that the resulting loss to the plaintiff was a peril insured against under Clause "I" of the policy.

The burden of proving a loss by a peril insured against is on the assured, the plaintiff. Richelieu & O. Nav. Co. v. Boston Ins. Co., 136 U.S. 408, 10 S.Ct. 934, 34 L.Ed. 398; Soelberg v. Western Assur. Co., 9 Cir., 119 F. 23, at page 31.

There is no dispute as to most of the facts and the first, and I think the essential question for determination, is whether the facts constitute a sovereign "restraint" within the coverage of the policy.

In 1941, prior to the entry of the United States into the war, Lloyd Brasileiro, a department of the Brazilian Government, the owner of the three vessels, applied to what was then the United States Maritime Commission for "warrants" for them. Vessels holding warrants are entitled to priorities and facilities for loading, discharging cargo, procurement of bunker fuel or coal, etc. 50 U.S.C.A.Appendix § 1283. The ship owner, receiving a warrant, obligates himself or itself to adhere to the rules and regulations promulgated by the United States Maritime Commission, including the routes and voyages which the vessel shall undertake. Later, by Executive Order No. 9054, 50 U.S. C.A.Appendix § 1295 note, 7 F.R. 837, the functions of the United States Maritime Commission were transferred to the War Shipping Administration. Warrants were issued for the Commandante Pessoa and for the Jaboatao on October 27, 1941 and for the Lesteloide on December 3, 1941.

Several Brazilian vessels having been sunk by submarines, Lloyd Brasileiro on March 10, 1942, ordered all its vessels in port to remain in port and such of its vessels as were at sea to put into the nearest Brazilian port. There is no proof that Lloyd Brasileiro [or any department of the Brazilian Government] issued such orders to any Brazilian vessels other than to those owned and operated. by Lloyd Brasileiro. At the time the Commandante Pessoa was en route from Victoria, Brazil,

to Para, Brazil; the Lesteloide was at Recife [Pernambuco] Brazil, where she remained until May 16; and the Jaboatao was at Rio, Brazil; but on the next day she sailed for Santos, Brazil, where she arrived on March 12th and remained until April 8th when she returned to Rio, where she remained from April 9th to April 30th, when she sailed for Recife, where she arrived on May 7th. On April 3rd, the Commandante Pessoa left Para to meet a convoy, but being unable to locate the convoy she returned to Para on April 5th where she remained until May 28th. The Jaboatao sailed for New Orleans May 12th, arriving there June 6th. The Commandante Pessoa sailed for New Orleans on May 28th arriving there on June 10th, and the Lesteloide sailed for New Orleans on June 8th and arrived there on June 14th.

On April 30, 1942, Mr. Azevedo, General Agent for Lloyd Brasileiro in the United States, wrote to the Wartime Insurance Committee of the United States War Shipping Administration, applying for hull war risk insurance on six specified vessels, four destined for New York, and two for New Orleans. The only vessel of the three now concerned, mentioned in his letter, was the Jaboatao The following day, according to Mr. Azevedo's testimony, he had a telephone conversation with Mr. Chubb or Mr Mather of the Insurance Committee of the War Shipping Administration and was informed that his applications for insurance would be granted, provided that the vessels went to New Orleans instead of New York and that they should proceed to New Orleans "for the safety of the vessels and the cargoes." Mr. Azevedo requested a telegram confirming the conversation and notified his home office by cable of these instructions, and on the same day called Rio on the telephone and talked with a director of his company [Lloyd Brasileiro] about this change of ports and the director ordered all Lloyd Brasileiro vessels to proceed to New Orleans. Accordingly, insurance was issued by the Wartime Insurance Committee on May 1st covering the Jaboatao and on May 14th covering the Commandante Pessoa and the Lesteloide. The Hull War Risks binders contain the following:

"Special conditions

"The owner of the vessel irrevocably and unconditionally agrees that in consideration of granting War Risk Insurance by the War Shipping Administration to

35

follow the direction of the Administrator as to the Port or Ports of discharge the nature and quantity of the cargo to be carried and as to freight rates. Any breach of this warranty shall automatically Void this insurance from inception."

On May 22nd Mr. Azevedo, after repeated requests to the War Shipping Administration for written confirmation of Mr. Mather [or Mr. Chubb's] telephone order of May 1st, received a telegram on May 22nd from Mr. King who was in charge of the traffic department of the War Shipping Administration, directing the six vessels [referred to in the application for insurance] to discharge their cargoes at New Orleans. It was apparently understood and accepted that the same directions should apply to the Commandante Pessoa and the Lesteloide which had received similar warrants and insurance. At the time this telegram was received the Jaboatao was on her way to New Orleans. Upon arrival of the Jaboatao, the Commandante Pessoa and the Lesteloide at New Orleans, the plaintiff procured and paid for carriage by rail of the castor beans to their factory in Bayonne, New Jersey. It is these payments for freight which is the loss claimed. Do these facts constitute "sovereign restraint" either by the Government of Brazil or by the United States Government?

■ Restraint of princes means the operation of the sovereign power by an exercise of vis major, in its sovereign capacity, controlling and divesting for the time, the dominion or authority of the owner over the ship. Bradlie v. Maryland Insurance Co., 12 Pet. 378, 37 U.S. 378, 9 L.Ed. 1123, and in marine and war risk policies restraint of princes applies only to acts done in the exercise of the sovereign power. Northern Pacific R. Co. v. American Trading Co., 195 U.S. 439, page 467, 25 S.Ct. 84, 49 L.Ed. 269; The Clavereak, 2 Cir., 264 F. 276, page 281.

■ It seems to me the evidence offered by the plaintiff, including the testimony of Mr. Azevedo, fails to establish that the Brazilian Government, in the exercise of its sovereign power, issued an order to the vessels in question as to their ports of destination, or to state it more precisely—that sovereign restraint was exercised by the Brazilian Government respecting these vessels. These merchant vessels were owned and operated by the Brazilian Government through a department, namely—the Lloyd Brasileiro, for the purpose of carrying privately owned cargoes in foreign trade for profit in competition with privately owned vessels. It was Lloyd Brasileiro which gave the orders to these vessels. It does not appear from the record that either Lloyd Brasileiro or Mr. Azevedo had any authority over Brazilian vessels other than those owned by Lloyd Brasileiro. The orders neither required nor evidenced an exercise of sovereign power; they were such orders as were within the powers of any privately owned and operated steamship company and were merely those which might be given by any cautious ship owner for the purpose of protecting his vessels, or to earn freight by the carriage of privately owned cargoes under ordinary bills of lading, such as any common carrier would issue and which gave them the contractual right, so far as the shippers and consignees of the cargo was concerned to do what was done.

It is also to be noted that this is a war risk policy and is limited to restraint of princes "in prosecution of hostilities." Becker, Gray & Co. v. London Assurance Corporation, [1918] A.C. 101. Brazil was a neutral Government at the time these events occurred and it is a reasonable presumption that she did not exercise her sovereignty in prosecution of hostilities. Cf. Queen Ins. Co. v. Globe Insurance Co. (The Napoli), 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402.

Next is the question as to whether or not there was a sovereign restraint by the United States Government.

■■ The United States Government is a sovereignty. Kohl et al v. United States, 91 U.S. 367, page 372, 23 L.Ed. 449; Liberty Mutual Ins. Co. v. Johnson Shipyards Corporation, 2 Cir., 6 F.2d 752, affirmed 269 U.S. 503, 46 S.Ct. 182, 70 L.Ed. 379; United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058. The United States Government may and does delegate certain of its sovereign duties and powers to its agencies, and when such agencies act within the scope of their delegated power, they act for and represent the sovereign. Federal Land Bank v. Priddy, 295 U.S. 229, 55 S.Ct. 705, 79 L.Ed. 1408; Wagner v. McDonald, 8 Cir., 96 F.2d 273; United States v. Walker River Irr. Dist., 9 Cir., 104 F.2d 334;

Riordan v. Ferguson, D.C., 42 F.Supp. 47; Banco de Espano v. Federal Reserve Bank, 2 Cir., 114 F.2d 438; City of Bisbee v. Cochise County, 50 Ariz. 360, 78 P.2d 982 at p. 986.

■ The War Shipping Administration, acting within the scope of its powers, was acting as the sovereign power of the United States Government under the authority of Executive Order 9054, 50 U.S.C.A.Appendix § 1295 note.

Lloyd Brasileiro voluntarily entered into an agreement with the United States Government through the United States Maritime Commission when it applied for and received ship warrants in 1941. Under that agreement or contract Lloyd Brasileiro was to receive certain privileges and priorities as to docking facilities, etc., and in turn was to follow the routing prescribed by the United States Maritime Commission; later by the War Shipping Administration and other rules and regulations promulgated by it. Subsequently Lloyd Brasileiro applied to the Wartime Insurance Committee for hull insurance which it obtained. One of the conditions of this contract for insurance was that the vessel owner would follow such routes and proceed to such ports as the War Shipping Administration should direct. And, in accordance with this agreement, the ports of discharge were arranged after conferences in the United States between the general agent of Lloyd Brasileiro [Mr. Azevedo] and Mr. King of the traffic department of the War Shipping Administration and the insurance department of the War Shipping Administration. No orders as to the port of discharge came from the United States Naval officers. When the vessels abandoned their originally intended voyages to New York and the owner decided to send them to New Orleans, the vessels were in Brazilian ports and they were not subject to the sovereign powers of the United States Government. The government of the United States could not and apparently did not attempt to exercise any sovereign rights over Brazilian vessels in Brazilian ports. The authority of the War Shipping Administration to give any instructions or advice with respect to the route or operation of these Brazilian vessels came not from the exercise of the sovereign power of the United States but from the Ship Warrant Act and the insurance contract.

According to Mr. Azevedo the telegram of May 22nd from Mr. King of the War Shipping Administration confirming the order of Mr. Chubb of the Wartime Insurance Committee, resulted from Lloyd Brasileiro's application for insurance.

It does not seem to me that the facts in the case at bar show an exercise of vis major by the United States in its sovereign capacity, controlling and divesting for the time, the dominion or authority of the owner over these vessels.

There is no evidence indicating that had these vessels gone to New York instead of New Orleans they would have incurred any penalty other than forfeiting their right to the priorities which they gained from the ship warrants and voiding their insurance. It does not appear that these nor any vessels were generally prohibited by this Government from proceeding to New York. New Orleans, and not New York, was agreed upon as the port of discharge in consideration of issuing the ship warrants and the insurance.

The inducements offered to neutral vessel owners for the purpose of obtaining the latter's consent indicate that the Government of the United States wished to avoid any attempt to exercise its sovereign power in the restraint of such vessels. Where the loss is occasioned by the voluntary conduct of the owner, however strong are the motives of the owner for so acting, it cannot be said that the loss is chargeable to the acts of the sovereign. Morgan v. United States, 14 Wall 531, 20 L.Ed. 738; Queen Insurance Co. v. Globe Rutgers Fire Insurance Co., 263 U.S. 487, 44 S.Ct. 175, 68 L.Ed. 402; Aktiebolaget M. Bank v. American Merchant Marine Ins. Co., 241 N.Y. 197, 149 N.E. 830; Cf. Standard Oil Co. v. United States, 267 U.S. 76, at page 77, 45 S.Ct. 211, 69 L.Ed. 519. This is so because such a loss is not occasioned by restraint of the sovereign.

In view of the conclusion that there was no sovereign restraint, neither by the Government of Brazil nor by the Government of the United States, it is unnecessary to consider the other questions that are raised.

The complaint is dismissed. Settle decree on notice.

Defendant to submit proposed findings of fact and conclusions of law on ten days notice.