**UNITED STATES v. STANDARD OIL CO. OF NEW JERSEY.**

**STANDARD OIL CO. OF NEW JERSEY v. UNITED STATES. THE YMS–12. THE JOHN WORTHINGTON.**

**Nos. A.131–151, A.153–203.**

United States District Court
S. D. New York, Admiralty Division.

Dec. 3, 1948.

John F. X. McGohey, U. S. Atty., Southern Dist. of N. Y., of New York City (Edward L. Smith, Sp. Asst. Atty. Gen., and Louis E. Greco, Sp. Atty., of New York City, of counsel), for the United States.

Kirlin, Campbell, Hickox & Keating (Edwin S. Murphy and Raymond T. Greene, all of New York City, of counsel), for Standard Oil Co. of New Jersey.

RYAN, District Judge.

These suits in the admiralty arise from a collision on the morning of December 16, 1942, between the United States Navy Ship YMS-12 and the steam tanker John Worthington, at sea in a buoyed channel in the approaches to the New York harbor.

The YMS-12 alone sustained collision damage.

The S.S. John Worthington, at the time of the collision, was being operated under the terms of a charterparty to the Government.

In one suit, the United States in a collision libel filed as owner of the YMS-12 sues the Standard Oil Company of New Jersey (hereafter, Standard Oil), as owner and operator of the S.S. John Worthington, for damages sustained by the YMS-12. The answer interposed pleads an affirmative defense based on the war risk insurance provided by the Government under Clause "20" of the charterparty.

In the second suit, Standard Oil sues the United States upon the contract of war risk insurance for any sum which Standard Oil may be held liable to pay in the collision action, and the expenditures necessarily incurred in the defense of that action.

The following findings of fact are made with the consent of all parties by stipulation; no issue of fact remains for determination by the court; all questions of fact have been resolved.

(1) At all material times the United States of America owned and operated the United States Ship YMS-12, a mine sweeper of the United States Navy, manned and commanded by the United States Naval personnel, and Standard Oil Company of New Jersey owned and operated the Steamship John Worthington, a tank ship.

(2) Between 5:00 and 6:00 a.m. on December 16, 1942, a collision occurred between the United States Ship YMS-12 and

S.S. John Worthington in a buoyed channel otherwise known as the swept channel in the approaches to the New York harbor. Said channel was marked by center line buoys from a point about twenty-three miles off Point Pleasant on the New Jersey Coast at Buoy A, Lat. 40 deg. 04' 50" N; Long. 73 deg. 31' 45" W, to a point in the vicinity of Ambrose Light Vessel, at Buoy I, Lat. 40 deg. 26' 46" N; Long. 73 deg. 51' 51" W.

(3) At the time of the collision the YMS-12 was part of a mine sweeping formation and was proceeding seaward with her mine sweeping gear streamed and displaying three all around green lights designating mine sweeping vessels towing mine sweeps in accordance with notice to mariners issued July 1, 1942, in addition to her regular running lights. Said mine sweeping formation consisted of three mine sweepers which were engaged in mine sweeping in said buoyed channel. The USS YMS-105 was the guide ship of the formation, which was proceeding on the easterly side of the swept channel, keeping the mid-channel buoys on the port hand. The YMS-12 was stationed several hundred yards on the starboard beam of the YMS-105 and the third vessel in the formation, the USS AMC-95, was echelon to the right of the guide ship, in a position approximately a half mile astern of and midway between the YMS-105 and the YMS-12.

(4) At the time of the collision, S.S. John Worthington was outbound from New York in ballast and was proceeding to sea in convoy, displaying regular and proper lights. The weather was clear, visibility good.

(5) The aforesaid collision was contributed to both by fault in the navigation of S.S. John Worthington and fault in the navigation of the United States Ship YMS-12, consisting of failures on the part of both vessels to comply with the applicable rules for the prevention of collisions and the requirements of good seamanship under the circumstances.

(6) S.S. John Worthington did not sustain any physical damage but the YMS-12 did sustain damage as a result of the collision.

(7) At the time of the collision S.S. John Worthington was operating pursuant to a time charter party between the United States of America and Standard Oil Company of New Jersey, duly executed and in force at all material times. Said time charter party contained among others, the following provisions:

"Clause 20. Unless otherwise mutually arranged, at all times during the currency of this Charter the Charterer shall provide and pay for or assume: (i) insurance on the Vessel, under the terms and conditions of the full form of standard hull war risk policy of the War Shipping Administration, which shall include malicious damage, sabotage, strikes, riots and civil commotion, insured for and valued at the amount set forth in Part I which insurance shall be made payable to the persons entitled thereto;

\*  \*  \*  \*  \*  \*

"Except as to risks or liabilities assumed, insured or indemnified against by the Charterer pursuant to this Charter, unless otherwise agreed, the Owner shall assume or insure against all other risks or liabilities of whatever nature including without limitation those of a Marine Hull and P. and I. nature and such Hull and P. and I. coverage shall also protect the interests of the Charterer to the extent of the liability it would have if it were the owner of the Vessel."

(8) At the time of the collision Standard Oil Company of New Jersey was insured by the United States of America against specified war risks with respect to S.S. John Worthington and a binder of insurance was issued by United States of America to Standard Oil Company of New Jersey and was in force at the time of the collision. Said binder of insurance contained, among others, the following provisions:

"War Risks Binder          R.C. No. 401
  Covering Vessels
  Requisitioned by the
      War Shipping Administration
      Division of Wartime Insurance
          Washington, D. C.
The War Shipping Administration hereby insures against War Risks Only the risks as listed in schedule below:

Assured  Standard Oil Company of New Jersey

Address  30 Rockefeller Plaza, New York, New York

Vessel  JOHN WORTHINGTON Flag U.S.

From  Time of delivery to War Shipping Administration about April 22, 1942

To  Termination of charter

1. Hull

DWT 12475 Speed 10.8 Knots Date Built 1920 Value $935,625.

Amount $935,625.

\* \* \* \* \* \*

3. This binder shall be subject to all the rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration. \* \* \*"

(9) Endorsement No. 1 to said war risk binder issued by the United States of America contained, among others, the following provisions: "2. This insurance shall be subject to all the rules, regulations, conditions and policy forms as prescribed by the War Shipping Administration in force at the time of issuance of the binder and shall be subject to the terms of the requisition charter party relative to this vessel accepted by the assured and any modifications or amendments thereto."

(10) The full form of standard marine and war risk policy of War Shipping Administration, including the war risk clauses annexed thereto, referred to in said binder and charter, in effect at all material times, contained, among others, the following provisions:

"Unless physically deleted by the Underwriters, the following warranty shall be paramount and shall supersede and nullify any contrary provision of the Policy:

F.C. & S. Clause. Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage, or expense caused by or resulting from capture, seizure, arrest, restraint, or detainment, or the consequences thereof or of any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise: also from all consequences of hostilities or warlike operations (whether there be a declaration of war or not), piracy, civil war, revolution, rebellion, or insurrection, or civil strife arising therefrom.

If war risks are hereafter insured by endorsement on the Policy, such endorsement shall supersede the above warranty only to the extent that their terms are inconsistent and only while such war risk endorsement remains in force."

\* \* \* \* \* \*

"Adventures and perils. Touching the Adventures and Perils which the Assurers are content to bear and take upon themselves, they are of the Seas, Men-of-War, \* \* \* and of all other like Perils, Losses, and Misfortunes that have or shall come to the Hurt, Detriment, or Damage of the Said Ship, etc., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the policy or by endorsement."

\* \* \* \* \* \*

"Full collision—Sister-ship collision. And it is further agreed that if the Vessel hereby insured shall come into collision with any other ship or vessel and the Owners or Charterers in consequence thereof or the Surety for either or both of them in consequence of their undertaking shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, the Assurers will pay the Owners or Charterers such proportion of such sum or sums so paid as the Assurers' subscription hereto bears to the value of the Vessel hereby insured, provided always that their liability in respect of any one such collision shall not exceed their proportionate part of the value of the Vessel hereby insured. And in cases where the liability of the Vessel has been contested, or proceedings have been taken to limit liability, with the consent in writing of a majority (in amount) of the Underwriters on the hull and/or machinery, the Assurers will also pay a like proportion of the costs which the Owners or Charterers shall thereby incur, or be compelled to pay; \* \* \*"

(11) The war risk clauses of said full form of standard marine and war risk policy of War Shipping Administration con-

tained, among others, the following provisions:

#### War Risk Clauses

Endorsement to be attached to and be made a part of Policy No. ———

It is agreed that this insurance covers only those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F. C. & S. warranty contained therein but which are excluded by that warranty.

This insurance is also subject, however, to the following warranties and additional clauses:

The Adventures and Perils Clause shall be construed as including the risks of piracy, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, floating and/or stationary mines and/or torpedoes whether derelict or not, and/or military or naval aircraft and/or other engines of war including missiles from the land, and warlike operations and the enforcement of sanctions by members of the League of Nations, whether before or after declaration of war and whether by a belligerent or otherwise; but excluding arrest, restraint, or detainment under customs or quarantine regulations, and similar arrests, restraints, or detainments not arising from actual or impending hostilities or sanctions. * * *"

(12) Standard Oil Company of New Jersey duly performed all the terms and conditions of said charter party and insurance contract on its part to be performed and did not carry any other insurance as to S.S. John Worthington.

(13) On December 7, 1945 proctors for Standard Oil Company of New Jersey wrote a letter to War Shipping Administration, Insurance Division, 99 John Street, New York, N. Y., as follows:

"December 7, 1945.

"War Shipping Administration,
  Insurance Division,
    99 John Street,
      New York, N. Y.

  "S. S. John Worthington—U.S.S.
      Y.M.S.–12
  "Collision December 16, 1942,

———

"Dear Sirs:

"On June 5, 1944, United States of America, as owner of the United States Ship Y.M.S.–12 filed a libel against Standard Oil Company of New Jersey claiming damages in the sum of $150,000. by reason of collision between the Y.M.S.–12 and the Steamship John Worthington on December 16, 1942.

"Standard Oil Company of New Jersey has referred the matter to us. We have advised our client that any liability on its part or on the part of the John Worthington is covered by insurance of United States of America, War Shipping Administration, in accordance with Clause 20 of the Warshipoiltime charter of the John Worthington, including the terms of the war risk binder issued to Standard Oil Company of New Jersey, with respect to said steamship.

"On behalf of Standard Oil Company of New Jersey we ask your consent, as war risk underwriter, that this case be defended for your account. You are hereby notified that Standard Oil Company of New Jersey will look to you for full indemnity as to any and all liability for damages sustained by the Y.M.S.–12 or by the United States by reason of said collision together with all costs and expenses incurred by Standard Oil Company of New Jersey in the defense of said action.

"Very truly yours,
        "Kirlin, Campbell, Hickox &
            Keating
"ESM:J        By: ———"

(14) On December 14, 1945 War Shipping Administration, 99 John Street, New York 7, N. Y., wrote a letter to the proctors for Standard Oil Company of New Jersey, which was received by the latter December 21, 1945 as follows:

"Messrs. Kirlin,        December 14, 1945
    Campbell, Hickox & Keating
    120 Broadway
    New York 5, N. Y.

"Attention: Mr. Edwin S. Murphy.
"Gentlemen:
        John Worthington–12/16/42–
            WH–4759. CHG.

"Please refer to your letter of December 7.

"We regret to advise that there is nothing contained in the one letter received from the Owners, under date of January 12, to indicate that we, as war risk underwrit-

ers, are concerned in any of the damages arising out of the collision. Furthermore, it is our view that the war risk protection afforded this vessel under the charter does not include claims under the Running Down Clause. It should also be borne in mind that any claim or suit by the United States of America, as Owners of the ship Y.M.S. –12, in which we might prove to be concerned, would be waived.

"In the circumstances, the defense of the suit would appear to be solely for the account of the Owners of the John Worthington and we presume that you will be guided by their instructions.

"Very truly yours,
"(signed) W. H. Cantwell
"Acting Chief Adjuster
Division of Maritime Insurance."

We come now to a consideration of the conclusions of law to be drawn from these facts—

■ (1) Both vessels being at fault, Standard Oil is liable to the Government for one half of the collision damages to YMS–12.

We have next to determine whether under the terms of the charter party and the risks assumed and insured against by the Government as war risk underwriter, this claim for one half the collision damages of the YMS–12 may be successfully maintained against Standard Oil.

■ The Government by the charter party accepted the war risks, requiring Standard Oil to assume sea risks ordinarily covered by the usual marine policy insuring against marine perils. The effect is to make the Government responsible for the risks of war as would be excluded by the F. C. & S. warranty, including all consequences of hostilities or warlike operations.

■ (2) The YMS–12 was actually engaged in a warlike operation at the time of collision.

■ Whether a vessel is engaged in a warlike operation is essentially a question of fact. Board of Trade v. Hain Steamship Company, [1929] A.C. 534, 538. We have found that the YMS–12, at the time of the collision, "was part of a mine sweeping formation and was proceeding seaward with her mine sweeping gear streamed," and this in the swept channel in the approaches to the New York harbor in time of war. Warlike operations are not to be confined to immediate attack upon the enemy. During war almost any movement of a war vessel in the course of her duties exercised in a war area is included; warlike operations include and cover operations defensive as well as offensive in character. The Petersham and Matiana [1921] 1 A.C. 99, 114. Mine sweeping conducted by a belligerent in the waters of the channels in the approaches to a great harbor of the belligerent is most certainly a warlike operation.

■ (3) The collision was a consequence of the warlike operation of YMS–12.

We have found that the collision was contributed to by the negligence and fault of both vessels "under the circumstances."

■ Faulty navigation on the part of YMS–12 does not change the character of its operations, nor does it render the collision any the less a consequence of a warlike operation.

"Faulty navigation on the part of one ship or the other is, of course, the determining factor of responsibility as between the two ships, but, in my opinion, it is not a legitimate factor for the other purpose which is here attempted—namely, of converting a war risk into a sea risk. Once the category of warlike operations attaches to the movements of the vessel, that category must continue to attach, although those movements had an element of negligence in their operations." Attorney General v. Adelaide Steamship Company, Ltd., [1923] A.C. (The Warilda) 292, 300.

In spite of the negligence on the part of both vessels involved herein the operation of YMS–12 continued to be a warlike operation even though negligently performed. Board of Trade v. Hain Steamship Company, supra, 539.

" * * * when the voyage itself is a warlike operation, the importance of a manoeuvre by the vessel to bring about a warlike operation largely disappears." Athel Line, Ltd., v. Liverpool & London War Risks Insurance Association, Ltd., [C.A. 1945] 1 K.B. 117, 120.

Of course, as Viscount Simon, L.C. observed in Yorkshire Dale Steamship Company, Ltd. v. Minister of War Transport (The Coxwold) [1942] A.C. 691, 696. "This, however, is an entirely different thing from saying that any and every accident which happens to such a ship during her voyage is the consequence of a warlike operation. * * * Authority is hardly needed for the proposition that you do not prove that an accident is 'the consequence "of" a warlike operation merely by showing that it happened "during" a warlike operation.'" (697)

Lord Sumner in Attorney General v. Adelaide Steamship Company, Limited (The Warilda), supra, (at p. 305) puts it to a true test when he asks whether the collision is caused "effectively and proximately" by the warlike operation. The dictum of Roche, J., in the Charente Steamship Co. v. Director of Transports, 38 Times L.R. 148, 149; aff'd 38 Times L.R. 434, that "Where, * * * an essential and necessary part of the direct and immediate cause of a loss was a warlike operation, whether well or ill conducted, the loss was a consequence of hostilities," is cited with approval in Attorney General v. Adelaide Steamship Company, Ltd. (The Warilda), supra (305), and again in Yorkshire Dale Steamship Company, Ltd. v. Minister of War Transport (The Coxwold), supra (699).

Whether we refer to the cause for which we search as the "direct and immediate cause" or the "effective and proximate cause" is not material, "it is the predominant and determining cause that is to be sought," Lord MacMillan in Yorkshire Dale Steamship Company, Ltd. v. Minister of War Transport, supra, at 702, and in this came case Lord Wright, citing Leyland Shipping Co., Ltd. v. Norwich Union Fire Insurance Co., [1918] A.C. 350, "'Proximate' here means, not latest in time, but predominant in efficiency, there is necessarily involved a process of selection from among the co-operating causes to find what is the proximate cause in the particular case."

It is true that the causes of an event are all the preceding circumstances which brought the event to pass—and they are myriad. As to what is the cause of an event, philosophers and logicians may differ from jurists. "The proximate cause of the law is not the proximate cause of the logician." Merrill v. Los Angeles Gas, etc., 1910, 158 Cal. 499, 503, 111 P. 534, 536, 139 Am.St.Rep. 134, 31 L.R.A.,N.S., 559.

We adopt as guideposts the thoughts expressed by Lord Wright in Yorkshire Dale Steamship Company, Ltd. v. Minister of War Transport, supra, at 706: "Causation is to be understood as the man in the street, and not as either the scientist or the metaphysician, would understand it. Cause here means what a business or seafaring man would take to be the cause without too microscopic analysis but on a broad view."

While Justice Holmes in Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 1923, 263 U.S. 487, 493, 44 S.Ct. 175, 176, 68 L.Ed. 402, observed that, "There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business * * *."

(Cf. Ætna Ins. Co. v. United Fruit Co., 304 U.S. 430, 438, 58 S.Ct. 959, 82 L.Ed. 1443), we do not find any conflict in this respect between the law of England and that of the United States. Indeed, in the same decision, Justice Holmes wrote 263 U.S. at page 492, 44 S.Ct. at page 176, 68 L.Ed. 402: "On the other hand the common understanding is that in construing these policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss. This is a settled rule of construction, and if it is understood, does not deserve much criticism * * *. Morgan v. United States, 14 Wall. 531, 20 L.Ed. 738 * * *."

In Link et al. v. General Ins. Co. of America (Eastern Prince and U.S.S. Roustabout), D.C., 56 F.Supp. 275; Id., D.C., 77 F.Supp. 977, we find a recent application of these principles. But see, Allocation of Risk between Marine & War Insurer, 51 Yale, L.J. 674.

Nor, do we find the decision of our learned brother, Judge Galston of the Eastern District of New York in Meseck Towing Lines, Inc., et al. v. Excess Ins. Co., Ltd., et al., 77 F.Supp. 790, 793, in conflict

with the views here adopted. It is quite apparent that there the court intended to limit its conclusions to the facts involved —that the collision occurred during a "preliminary manoeuvring in a peaceful harbor prior to reaching an appointed war station. * * *"

■ We look, then, for the cause "predominant in efficiency" and this merely involves "a process of selection from among the co-operating causes to find what is the proximate cause in the particular case." Lord Wright, in Yorkshire Dale Steamship Company, Ltd. v. Minister of War Transport, supra, p. 706; British and Foreign Steamship Company, Ltd. v. The King (St. Oswald v. Suffren), [1918] 2 K.B. 879, 890-91.

■ It is argued by the Government that the negligence of the masters of both vessels was a new, separate and distinct factor intervening between the warlike operation and the collision, and that the collision was a consequence of that negligence and not of the warlike operation. With this, we cannot agree.

Here, concededly, negligence in navigation existed on the part of both masters, but that negligence did not break the chain of causation so as to prevent the loss from being attributable to the warlike operation. The YMS-12 and the two accompanying vessels, in mine sweeping formation, proceeding with mine sweeping gear streamed and trailing paravanes, presented an unusual and unexpected obstacle to navigation. YMS-105 was the guide ship of the formation, the YMS-12 was stationed several hundred yards on the starboard beam of the YMS-105 and the third vessel in the formation, the AMC-95, was echelon to the right of the guide ship, in a position approximately a half mile astern and midway between the YMS-105 and the YMS-12. From the time of the encounter until actual collision the vessels continued in their mine sweeping operations with their paravanes trailing; in all her manoeuvres and in her navigation the YMS-12 was necessarily restricted and impeded. This unusual formation, of which the YMS-12 was a part, closed to the S.S. John Worthington lanes of navigation affording possible escape which would ordinarily have been open to her.

The negligence found to exist was negligence "under the circumstances" of the special and extraordinary conditions existing—conditions created by the warlike operation of mine sweeping.

■ (4) The liability of Standard Oil, as owner of the John Worthington, to the United States of America for any part of the damage sustained by the YMS-12 is covered by the war risk insurance issued by the United States under Clause "20" of the charter party. (Finding of Fact 7).

A somewhat similar problem was presented in Adelaide Steamship Company, Ltd. v. Attorney General (The Warilda), [1926] A.C. 172. This appeal terminated the litigation which arose out of the collision between the ambulance transport "Warilda" and the merchant vessel "Petingaudet." It had been previously determined that the collision was due to the negligence of the master of the "Warilda" and that this ship was liable to the "Petingaudet" for her damages. But, it was subsequently adjudged that the collision was a consequence of a warlike operation in which the "Warilda" was engaged ([1923] A.C. 292). The question answered by the final appeal, was (p. 178): "Whether the liability undertaken by the collision cause is or is not a risk which would be excluded by the 'f.c. and s.' clause set out in cl. 19 of the charterparty, as being a consequence of warlike operations." The Court held that the liability was not so excluded and recovery to the "Warilda" was denied.

Viscount Cave, L. C. wrote (at 178-79): "It was held in Ionides v. Universal Marine Insurance Co. (n. 14 C.B. (N.S.) 259), and has not since been doubted, that in applying the exception created by the f.c. and s. clause the Court must look at the proximate and not at the remoter consequences of the warlike operation; and while it has been decided by this House that the collision itself and the consequent damage to the Warilda were the direct result of the warlike operation in which the Warilda was engaged, it does not follow that the liability of the Warilda to the owner of the Petingaudet falls within the same category.

That liability arose, not from the collision taken by itself, but from the negligence of the master of the Warilda, which alone constituted the cause of action, and was, therefore, not a direct and proximate consequence of the warlike operation. This seems to me to follow from the decision in the case of De Vaux v. Salvador (n. 4 Ad. & E. 420, 431), where it was held that the sum which a shipowner had to pay for damage to another ship caused partly by the negligence of his servants was too remote from the sea perils against which his ship was insured to be recovered by him under a marine policy. Lord Denman, in delivering the judgment of the Court in that case, said: 'The ship insured is driven against another by stress of weather; the injury she thus sustains is admitted to be direct, and the insurers are liable for it. But the collision causes the ship insured to do some damage to the other vessel; and, whenever this effect is produced, both vessels being in fault, a positive rule of the Court of Admiralty requires the damage done to both ships to be added together, and the combined amount to be equally divided between the owners of the two. It turns out that the ship insured has done more damage than she has received, and is obliged to pay the owners of the other ship to some amount, under the rule of the Court of Admiralty. But this is neither a necessary nor a proximate effect of the perils of the sea; it grows out of an arbitrary provision in the law of nations from views of general expediency, not as dictated by natural justice, nor (possibly) quite consistent with it; and can no more be charged on the underwriters than a penalty incurred by contravention of the revenue laws of any particular state, which was rendered inevitable by perils insured against.' "

And, the learned judge continued (at p. 179) : "It is true that the policy to be hypothesized under cl. 19 of the charterparty is a policy containing the collision clause, and that where that clause is present in a policy the underwriters are liable for a proportion of the damage caused to the other ship; but this is the result, not of a loss by the perils insured against, but of the 'special contract' of the underwriters contained in the collision clause: see Xenos v. Fox, (n.L.R. 3 C.P. 630, 635)."

Bovill, C. J. in Xenos v. Fox, supra, wrote (at p. 634) : "It has long been settled that an ordinary policy does not cover the liability for damage done to another vessel by the negligence of those in charge of the vessel insured; and such a case would not come within the ordinary perils insured against, or within the usual suing and labouring clause in an ordinary policy. A collision clause in various forms has therefore for many years been in use where parties desire to be protected against the consequences of a collision arising from the fault of their own vessel. It is in each case a special contract very different from the contract of insurance in its ordinary form; and the liability under it does not depend upon the ordinary perils covered by the policy, but upon the special matters mentioned in the clause itself."

We turn then to an examination of the material provisions of the marine policy and war risk endorsement here involved.

It was the manifest intent and general scheme of the insurance to exclude from the marine policy certain risks including those caused by or resulting from "all consequences of hostilities or warlike operations," and to assume by the war risk endorsement all risks so excluded from the marine policy.

The war risk endorsement reads as follows:

"War Risk Clauses

Endorsement to be attached to and made a part of Policy No. ———

It is agreed that this insurance covers only "those risks which would be covered by the attached policy (including the Collision Clause) in the absence of the F.C. & S. warranty contained therein but which are excluded by that warranty." (Finding of Fact, 11 supra).

The second paragraph of the "F.C. & S." clause provides: "If war risks are hereafter insured by endorsement on the Policy, such endorsement shall supersede the above warranty only to the extent that their terms are inconsistent and only while such war risk endorsement remains in force." (Finding of Fact 10, supra).

This, in effect is a subordination clause whereby the scope of the "F.C. & S." clause must be read as coextensive with the undertaking contained in the war risk endorsement.

Thus, the first paragraph of the "F.C. & S." clause should be read: "Notwithstanding anything to the contrary contained in the Policy (including the collision clause), this insurance (including the collision clause), is warranted free from any claim for loss, damage, or expense caused by or resulting from * * * all consequences of hostilities or warlike operations. * * *"

The clause involved in Adelaide Steamship Company, Ltd. v. Attorney General, supra, is set forth at length (at pp. 177–78): "Clause 19 of the charterparty T.99 (which has the marginal note 'War risks damage or loss of ship') is in the following terms: '19. The risks of war which are taken by the Admiralty are those risks which would be excluded from an ordinary English policy of marine insurance by the following or similar, but not more extensive clause: "Warranted free of capture, seizure, and detention and the consequences thereof, or of any attempt thereat, piracy excepted, and also from all consequences of hostilities or warlike operations whether before or after declaration of war." ' "

Its effect was to be measured as though "an ordinary English policy of marine insurance" had been issued, containing what amounted to a form of "F.C. & S." clause. When compared to the clauses here involved we find that it does not contain the words "including the Collision Clause" or any similar words.

It appears that the whole purpose of the subordination was to make the exclusion of the "F.C. & S." clause commensurate with what was assumed by the war risk endorsement. The result is that the running-down liability for war risk collision is excluded from the marine policy and that the war risk underwriters assume the collision liability so excluded.

(5) It follows that the United States of America must indemnify Standard Oil against all the costs of defense of the suit brought by it, and this amount will be determined by usual reference.

Proctors will confer with the court on December 16, 1948 at 10:30 a.m. in chambers on the terms of decrees to be entered; proposed decrees will be noticed for settlement for that day.