525 F.2d 717
 Inez H. LENFEST and Marine Midland Grace Trust Company of
New York, as Executors of the Estate of Harold C.
Lenfest, and Kenneth F. Yarrington,
Plaintiffs-Appellants,
v.
Harold W. COLDWELL, Defendant-Appellee.
FERRO--BET CORPORATION OF AMERICA, Plaintiff-Appellant,
v.
Harold W. COLDWELL, Defendant-Appellee.
 Nos. 54, 74, Dockets 74--2659, 74--2660.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 17, 1975.
Decided Nov. 6, 1975.
 
 W. Shelby Coates, Jr., New York City (Wilbur E. Dow, Jr., New York City, of counsel), for plaintiffs-appellants in 74--2659.
 Joseph D. Tarlowe, New York City, for plaintiff-appellant in 74--2660.
 William Warner, New York City (Symmers, Fish & Warner, New York City, of counsel), for defendant-appellee.
 Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 This is an appeal from a decision by Judge Carter in the United States District Court for the Southern District of New York, denying plaintiffs any recovery on their 'Anticipated Profits' marine insurance policy. Plaintiff Ferro-Bet Corporation was the time charterer of the vessel S.S. PANOCEAN from October, 1963 until sometime in the summer of 1964.[1] Plaintiffs Lenfest[2] and Yarrington were financiers of Ferro-Bet. All plaintiffs were insured under an 'Anticipated Profits' policy issued by a group of London marine insurers who have designated Harold Coldwell as their nominee in this action. The question presented on appeal is whether the district court erred in finding that plaintiffs failed to prove the vessel either an actual total loss, a constructive total loss, or a compromised total loss, as the policy required, and were hence not entitled to recover.
 
 
 2
 * A. The Policies and Other Preliminaries
 
 
 3
 When the charter was arranged, the owners of PANOCEAN (not parties to this suit) had insurance policies on the hull and machinery of the vessel for $240,000. Under such policies, not directly in issue, the owners were insured against the partial or total destruction or loss of the vessel's structure and machinery (e.g., engines, auxiliaries and boilers).[3]
 
 
 4
 The 'Anticipated Profits' 'honor'[4] insurance policy issued to the plaintiffs was to run for a twelve-month period beginning on October 29, 1963. The policy provides for payment to the plaintiffs 'On--Anticipated Profits--Amount $150,000.'[5] The insurers were
 
 
 5
 'to pay the above sum in the event the vessel becomes a total and/or constructive and/or arranged and/or compromised total loss as a result of Marine or War perils' (emphasis added).
 
 
 6
 The 'Institute T.L.O.' or 'Inchmaree' clause, to which these insurance contracts were also subject, further provides that
 
 
 7
 '1. This insurance covers only:--Total Loss (Actual or Constructive) of the Vessel (including total loss directly caused by:--
 
 
 8
 '. . . Bursting of boilers, breakage of shafts, or latent defect in the machinery or hull
 
 
 9
 '. . . Negligence of Master, Officers, Crew or Pilots)
 
 
 10
 'provided such loss or damage has not resulted from want of due diligence by the Assured, Owners or Managers.'
 
 The policy provides further that
 
 11
 '(i)n ascertaining whether the Vessel is a constructive total loss . . . nothing in respect of the damaged or break-up value of the Vessel . . . shall be taken into account. No claim for constructive total loss based upon the cost of recovery and/or repair of the Vessel shall be recoverable hereunder unless such cost would exceed the insured value in the policies on hull and machinery.'[6]
 
 
 12
 By the terms of the policy, plaintiffs could recover on 'anticipated profits' in the event that the vessel became a) an actual total loss; b) an arranged or compromised total loss; or c) a constructive total loss, as a result of marine or war perils, or crew negligence (unless due to lack of due diligence by owners or insureds). For the ship to become a constructive total loss, the costs of recovery and/or repairs to the ship would have had to exceed $240,000 (the insured value on hull and machinery).
 
 B. The Calamitous Voyage
 
 13
 The PANOCEAN's charter began comfortably enough. In late November 1963 the vessel proceeded in ballast from Curacao to New Orleans where a cargo under a Cook Grains, Inc., subcharterparty was loaded and carried to Marseilles.[7] She went on to Seville where baryte ore destined for New Orleans was loaded. At Leixos, Portugal, she took on other cargo. She then proceeded to London to discharge cargo and incurred some minor damage while in her berth. After loading at Immingham steel coils destined for Baltimore, PANOCEAN proceeded to Flushing, Netherlands, for bunkers.
 
 
 14
 In the subsequent passage between Flushing and Baltimore it was stipulated that the vessel encountered heavy weather, and that the voyage lasted from February 24 to April 3, 1964. The stipulation continued:
 
 
 15
 'Damages and/or equipment losses occurred on the forecastle deck, the main deck, the upper bridge deck, the boat deck, the '02' deck, and the poop deck; and in the engineering spaces of the vessel. The vessel's Scotch Boiler was subjected to heavy accumulation of salt, scale and soot from use of raw sea water; and both the starboard and the port Lamont boilers were subjected to use of raw sea water, and heavy accumulation of salt, scale and soot. It was necessary for the vessel to put into Azores and Bermuda as 'ports of refuge' before Baltimore could be reached.'
 
 
 16
 Stipulation 1/28.
 
 
 17
 Under the charterparty, the PANOCEAN was 'off hire' while the owner had her repaired in Baltimore, for about two months, until June 5, 1964, when she was tendered back to the time charterer as ready. She sailed out of Baltimore on June 12, 1964, but within two hours suffered a steering engine telemotor control system failure (apparently due to negligently made repairs), and was forced to anchor for repairs.[8]
 
 
 18
 After further repairs were made, the voyage resumed on June 16, but the ship again ran into trouble, and was forced to drop anchor off Port Everglades, Florida, to make repairs on account of boiler carryover problems unconnected with earlier damage. On June 22, the vessel stranded while at anchor off Port Everglades, suffering numerous bottom 'setups and indentations from the sand and coral bottom. She was refloated with the assistance of a tug on June 26 and docked the next day at Port Everglades for repairs.
 
 
 19
 She did not arrive in New Orleans until July 18, 1964, almost a month later. There she was drydocked for engine repairs which were effected by July 31. Various permanent hull repairs costing some $40,000 should have been made at this time, but were deferred by the owner. After she arrived at New Orleans and before she departed, a dispute arose between the charterer and the owner, and the status of the charterparty went to arbitration. The vessel left New Orleans again, off charter, and sustained additional serious injuries in the Gulf of Mexico in September 1964. The owners sold the vessel as scrap in late 1964.
 
 
 20
 On June 26, 1964, while the vessel was in drydock for repairs at Port Everglades, Tradax Export cancelled a subcharter with plaintiff Ferro-Bet, pursuant to its option to cancel if the PANOCEAN was not ready to load soybeans in New Orleans by June 20. Plaintiffs claim that they also lost the Cook Grains subcharter when Ferro-Bet's chief financiers, Marine Midland Bank, refused to permit substitution of a vessel, forcing an abandonment of the enterprise.
 
 C. The Course of Adjustment
 
 21
 On May 20, 1964, while the vessel was under repair in Baltimore and after serious expressions of anxiety by its subcharterers and lenders, Ferro-Bet made its first demand for payment under the Anticipated Profits policy.[9] On February 25, 1965, the owners of PANOCEAN authorized their average adjuster,[10] Great Eastern Associates, Inc., to settle all PANOCEAN claims (exclusive of salvage costs) arising during 1964 for $235,000. Two days later, however, the owners reduced the figure to $225,000. On March 4, 1965, Great Eastern Associates cabled the insurance brokers in London with a breakdown of disbursements and unrepaired damages making up the owner's gross claim against the insurers of $444,246. The insurers had already advanced some $126,794 for repairs in Baltimore. After deducting $15,000 for estimated general average contributions[11] from cargo interests, Great Eastern's cable indicated a 'balance due' from the insurers of $302,452 (on an aggregate claim of $429,246). An exchange of telegrams resulted in Great Eastern and the owners accepting an immediate settlement of $225,000; an additional $45,220.07 was later paid over for general average costs at Port Everglades.[12]
 
 D. The Decision Below
 
 22
 The District Court correctly held that the Baltimore repairs and damages had resulted from insured-against marine perils. Relying on the report of the underwriter's survey, done on behalf of the London Salvage Association, the court found that $155,006 in necessary repairs had been accomplished at Baltimore, and that estimated repairs of $49,340 on the Port Lamont boiler had been deferred. Appellees concede that these two sums may properly be added in determining the existence of a constructive total loss.
 
 
 23
 The district court also found that the Azores and Bermuda were ports of refuge, as was stipulated, and that the claimed costs at those ports were properly to be included in determining the costs of repair and recovery. The court relied on Compania Maritima Astra, S.A. v. Archdale (The ARMAR), 134 N.Y.S.2d 20 (S.Ct.1954), which held the costs of 'salvage, pilotage, towage and superintendence' includible in computing constructive total loss costs. The costs accepted were, at the Azores, $538.15 for 'disbursements' and $2,380.29 for 'vessel allowances,' and, at Bermuda, $1,028.60 for 'disbursements' and $3,166.67 for 'vessel allowances.' Since all these expenses in the aggregate did not total over $240,000 (but amounted to only $211,459.71), the court found that there was no constructive total loss at Baltimore.
 
 
 24
 The court did not take into account, however, certain items of cost incurred at Baltimore, namely, 'disbursements, vessel allowances and survey fees,' though these appeared to be like the items of disbursements and allowances at Azores and Bermuda which were allowed. The court gave no explanation for the different treatment of costs incurred at Baltimore. Though Baltimore was a scheduled port of call, it was also the first port at which heavy repairs could be made in drydock. Appellants contend that the court should have included as admissible costs at Baltimore the following:[13]
 
 
 25
 Appellees contend that the evidence is insufficient to establish the claimed costs at Baltimore, or, indeed, the allowed costs at the Azores and Bermuda, the stipulated ports of refuge.
 
 
 26
 The district court held the $40,000 in deferred hull repairs at New Orleans to be irrelevant on the ground that the plaintiffs had not proved that the damage from the Port Everglades stranding had resulted from marine perils covered by the insurance. The court limited the allowable costs to those incurred before the vessel left Baltimore.
 
 
 27
 There is no contention by the underwriters that if the cost of repairs exceeded $240,000, the plaintiffs are not entitled to recovery. This court need not consider, therefore, whether, if that amount is reached, the constructive total loss was the proximate cause of the plaintiffs' loss of profits, for the underwriters have not tendered such an issue. Cf. Robertson v. Petros M. Nomikos, Ltd., (1939) A.C. 371; Continental Grain Co. v. Christie, 22 N.Y.S.2d 57, 60 (S.Ct. 1940); Continental Grain Co., Inc. v. Twitchell, (1945) 78 Lloyd's List L.R. 251 (C.A.); Roura & Fourgas v. Townsend, (1918) 1 K.B. 189.
 
 II
 
 28
 To determine whether the plaintiffs were entitled to recover, we must explore the meaning of the terms 'total loss,' 'constructive total loss,' and 'arranged and/or compromised total loss.'[14] Although these phrases have evolved out of long-standing custom and practice in marine insurance, they nonetheless leave unclear some of the key issues in this case.
 
 
 29
 We readily find that there was no 'total loss.'
 
 
 30
 A total loss of a vessel occurs when the vessel no longer exists in specie or when she is absolutely and irretrievably sunk or otherwise beyond the possible control of the insured. Since the PANOCEAN was afloat and was capable of being repaired, there was no actual total loss. Insurance Co. v. Fogarty, 86 U.S. 640, 22 L.Ed. 216 (1873); Hugg v. Augusta Insurance & Banking Co., 48 U.S. 595, 12 L.Ed. 834 (1850); Monroe v. British & Foreign Marine Insurance Co., 52 F. 777 (1 Cir. 1892); Carr v. Security Insurance Co., 109 N.Y. 504, 17 N.E. 369 (1888); Gilmore & Black, supra, § 2.14.
 
 
 31
 The doctrine of 'constructive total loss' was designed to alleviate the harshness of the requirement of an 'actual total loss,' where a shipowner is the insured, and where the costs of repairs would exceed the repaired value of the ship. It enables the shipowner to 'abandon' the vessel as if she were a total loss, while preserving to the insurer the right to recoup what it might from the sale or other disposition of the vessel abandoned to it. Calmar Steamship Corp. v. Scott, 209 F.2d 852 (2 Cir. 1954); Canada Sugar Refining Co. v. Insurance Co. of North America, 82 F. 757, 758 (S.D.N.Y.1897), rev'd, 87 F. 491 (2 Cir. 1898), rev'd (aff'g district court), 175 U.S. 609, 20 S.Ct. 239, 44 L.Ed. 292 (1900). In time, common law admiralty rules concerning the measure of value to be applied in determining whether there was a constructive total loss were, to some extent, superseded by the British Marine Insurance Act of 1906,[15] and through policies which abrogated common law presumptions by their express terms. Thus, where the policy provided that the insured value shall be taken as the repaired value, the insured value controls absolutely even if the insured value exceeds the actual value of the vessel at the time of the insurance or of the accident. Rock Transport Properties Corp. v. Hartford Fire Insurance Co., 312 F.Supp. 341, 347 n. 21 (S.D.N.Y.), aff'd, 433 F.2d 152 (2 Cir. 1970). See 2 Arnould, Marine Insurance 1081 (15th ed. 1961).
 
 A. Constructive Total Loss at Baltimore
 
 32
 Several factors are of importance in approaching the question of whether there was a constructive total loss at Baltimore. Plaintiffs-insureds are time charterers, and not the owners of the vessel. As a consequence, the res which they insured was their anticipated profit, and not the vessel itself. Continental Grain Co. v. Christie, supra, at 60; Continental Grain Co., Inc. v. Twitchell, supra. The condition precedent to their right to recover was the occurrence of a total loss as defined in the owner's policy on the vessel; yet without physical control of the vessel, the interests of the time charterer could be more easily defeated than those of the owner. A constructive total loss of the vessel is only a condition precedent to the charterer's right to recover, while for the owner, the constructive total loss of the ship is not only the condition of recovery but the insured res itself. The relatively helpless position of the charterer in the face of loss of freight and anticipated profit, a condition known in advance to the insurer, suggests that we interpret with some liberality the costs allowable in the determination of whether there was a constructive total loss.
 
 
 33
 There is no dispute that the damage repaired at Baltimore resulted from insured-against perils--heavy weather and crew negligence. There was ample evidence in the record to support this finding. See plaintiffs' exhibits 4, 7, 15, 27; Stein Hall & Co., Inc. v. S.S. CONCORDIA VIKING, 494 F.2d 287, 292 & n. 5 (2 Cir. 1974) (liberal rules of evidence and of Business Records exception to hearsay rule in admiralty).[16] The primary questions on this appeal are the correctness of the district court's calculation of allowable costs at Baltimore and its exclusion of any costs subsequent to the Baltimore repairs.
 
 
 34
 The few cases which have considered what costs are allowable in computing whether there has been a constructive total loss have involved vessels which had actually been abandoned, and in which the claimed figures for costs of repair and recovery were largely estimates. The teaching of cases such as THE MEDINA PRINCESS, (1965) 1 Lloyd's List L.R. 361; Calmar Steamship Corp. v. Scott, 209 F.2d 852 (2 Cir. 1954), and Compania Maritima Astra, S.A. v. Archdale (The ARMAR), supra, is that the trier of fact must scrutinize with care anticipated expenses, making an independent determination of what the expenses really would have been.[17] It is within the discretion of the trial court wholly to disallow certain items of anticipated expense as unrealistic.
 
 
 35
 Here the claimed expenses were in large part actually incurred by the owners and the determination of which of these expenses, if reasonable, should be allowed is a question of law. To determine the legal questions, however, we need more detailed findings on what these costs were for, and particularly, how they relate to the repair of the vessel. A remand for more detailed findings is required, especially since the figure arrived at by the court was less than $30,000 short of the crucial sum of $240,000. The district court should make clear on remand whether particular claimed expenses fall into the category of 'salvage, pilotage, towage and superintendence.'
 
 
 36
 Of particular difficulty is the absence of a finding which describes in detail what the claimed figure of $10,095.42 for 'vessel allowances' at Baltimore (without which the Baltimore costs could in any event not exceed $240,000) consists of. There is some evidence that the 'vessel allowances' were for 'crew wages and overtime.' If the allowances in the Azores and Bermuda were actually for 'crew wages and overtime,' they were properly included as maintenance of necessary crew in a port of refuge pending substantial repairs. At Baltimore, where it could have been anticipated that substantial repairs would cause the ship to be laid up for close to two months, the rule may be otherwise.
 
 
 37
 Generally, wages and crew maintenance are not allowable as items unless the crew assisted in or was 'necessary in connection with the repair of the vessel.' Compania Maritima Astra, S.A. v. Archdale (The ARMAR), supra, at 32; Hall v. Ocean Insurance Co., 38 Mass. (21 Pick.) 472, 480 (1839); Lord, The Hull Policy--Actual and Constructive Total Loss and Abandonment, 41 Tulane L.Rev. 347, 353 (1967). See also THE MEDINA PRINCESS, supra, at 433. On the other hand, where the crew makes repairs or would have assisted in repairs, or where the crew is necessary to guard the vessel or to superintend the repair work, the expenses may properly be considered in determining whether there was a constructive total loss. Compania Maritima Astra, S.A. v. Archdale (The ARMAR), supra; Jeffcott v. Aetna Insurance Co., 40 F.Supp. 404 (S.D.N.Y.1941), aff'd, 129 F.2d 582 (2 Cir.), cert. denied, 317 U.S. 663, 63 S.Ct. 64, 87 L.Ed. 533 (1942).[18]
 
 
 38
 We must, therefore, as part of our remand, ask for particular findings on what the 'allowances' item of $10,095.42 was for, and, if for the crew, which of the crew remained on board and for what purposes. On remand the district court will also make findings on the other expenses at Baltimore, and on the Azores and Bermuda expenses.
 
 
 39
 Though we may ultimately conclude that plaintiffs failed to meet their burden of proof by a preponderance of the evidence, we think, in view of the dearth of authority on the construction of this type of marine insurance policy and the absence of detailed findings, justice suggests that on remand the district court may, if necessary to its findings, take further evidence on the limited issues remanded. See Porter v. Leventhal, 160 F.2d 52, 59 (2 Cir. 1946). See also Ford Motor Co. v. N.L.R.B., 305 U.S. 364, 373, 59 S.Ct. 301, 83 L.Ed. 221 (1939); Glapion v. MS. JOURNALIST, 487 F.2d 1252, 1255 (5 Cir. 1973); Watz v. Zapata Off-Shore Co., 431 F.2d 100, 118 (5 Cir. 1970); Manning v. M/V SEA ROAD, 358 F.2d 615, 618 (5 Cir. 1965); Crain Bros., Inc. v. Duquesne Slag Prods. Co., 273 F.2d 948, 951 (3 Cir. 1959); Farley v. United States, 252 F.2d 85, 88 (9 Cir. 1958); Dixon v. United States, 219 F.2d 10, 18 (2 Cir. 1955).
 
 
 40
 In reconsidering its findings with respect to the Baltimore expenses, the district court should also be more specific in explaining why certain expenses were not included, or if they were, under what heading. For instance, the surveyor's report relied on by the district court failed to include the cost of replacing lifeboat equipment lost in the storm. This is a legitimate expense to be counted in determining whether there was a constructive total loss. See Marine Insurance Act, Rules for Construction of Policy No. 15; American Institute Hull Clause--Vessel (January 18, 1970). Also, a summary by the average adjuster indicated that a pump filter had to be replaced at additional cost beyond the $155,006 estimate relied on by the court; more detailed findings are necessary here to clarify whether expenses which were disallowed were disbelieved, or whether they were disallowed as a matter of law. Additionally, we note that expenses properly incurred to repair damage from negligently made repairs may be included in computing constructive total loss costs; this requires more detailed findings concerning the costs of the repairs just outside Baltimore and whether the repairs were made necessary by earlier negligent repairs, including failure to repair the port boiler. These costs may include wages and victualling of crew during the two-day layover to make repairs. L. J. Buglass, Marine Insurance and General Average in the United States 85 (1973).
 
 
 41
 B. Constructive Total Loss After Baltimore--The Question of Cumulation
 
 
 42
 Appellant contends that, even if the ship was not a constructive total loss at Baltimore, repair costs arising after the ship left Baltimore may be cumulated with the repairs made and deferred at Baltimore.[19] In opposing this view, appellee argues that once the ship has been repaired and sails again, subsequent repair costs incurred from successive casualties may not be cumulated for constructive total loss purposes.
 
 
 43
 Although this question was left open in THE MEDINA PRINCESS, supra, we agree that independent successive casualties incurred after the ship has been repaired may not be cumulated. It is true that the anticipated profits policy is silent on whether the 'costs of recovery and/or repair' must arise out of a single incident or exist at a single time.[20] To permit cumulation of repairs after the ship has been repaired, however, would obliterate the difference between insurance policies on partial loss (under which the insurer may be required to pay out, over the term of the policy, amounts which in toto exceed the insured valuation limit applicable to any one partial loss)[21] and total loss policies. Had the plaintiffs desired protection against the loss of profits caused by successive partial losses, they were free to negotiate with the insurers to pay the higher premiums such additional insurance would doubtless have required. Moreover, conceptually, once the ship has been adequately restored to service, she is a seaworthy ship, and it could hardly have been intended that the cost of repairs from a new, independent cause should be added to repairs already done to the restored ship.[22]
 
 
 44
 That is not to say that the ship, once restored, may not later, on the basis of a new serious catastrophe, become a constructive total loss. If the costs incurred from repairing the new damage exceed the insured value of the owner's policy, the charterer is, indeed, in a position to contend that a constructive total loss has occurred. We think also there is a carryforward of costs from damages incurred in the earlier incidents but not repaired at Baltimore. In this case, the carryforward would be $49,340 in deferred boiler expense at Baltimore. The district court did not address the issue of determining possibly allowable subsequent repair costs, for the simple reason that it found that the damages caused by the stranding at Port Everglades had not resulted from 'perils of the sea' insured under the policy. While we hold that this finding was error on this record,[23] our ruling will not affect the plaintiffs' right to recovery. Even if the stranding was due to a 'peril of the sea' or to negligence of the crew under the Inchmaree clause, the claimed damages[24] thereafter could not aggregate $240,000 even including the deferred expense at Baltimore of $49,340.C. Arranged or Compromised Total Loss
 
 
 45
 In the absence of findings below, we cannot determine whether the settlement between the shipowner and its underwriters was for a 'total constructive loss' or for a series of 'partial losses' as appellees contend.[25]
 
 
 46
 The case is remanded to the district court to make findings of fact and conclusions of law under F.R.Civ.P. 52(a) in conformity with this opinion with respect to (a) whether allowable costs exceed $240,000 and (b) whether the amounts paid by the insurers to the owners were in settlement of a constructive total loss claim.
 
 
 
 [1]
 Under the time charter, the owner remained responsible for providing the crew, and running, maintaining and repairing the ship, while the charterer was responsible for the vessel's itinerary and her cargo, to be arranged through the grant of subcharters. See G. Gilmore and C. Black, The Law of Admiralty § 4--14, at 230--31 (2d ed. 1975)
 
 
 [2]
 Harold C. Lenfest died after consolidation of the actions. The executors of his estate, Inez Lenfest and Marine Midland Grace Trust Co., were substituted as plaintiffs
 
 
 [3]
 The owners also had a policy on 'increased value' on the hull and machinery for $60,000 recoverable only in the event that the vessel became a total and/or constructive total and/or arranged total and/or compromised total loss
 
 
 [4]
 An 'honor' policy is one in which the underwriters agree (in this case, through a 'Policy Proof of Interest,' 'FULL INTEREST ADMITTED' clause) not to contest whether the insureds have an 'insurable interest.' In the United States 'honor' policies are not necessarily binding, and the insurer may affirmatively show the absence of an insurable interest. Gilmore & Black, supra, § 2--5, at 61 n. 45; Frank B. Hall & Co. v. Jefferson Ins. Co., 279 F. 892 (S.D.N.Y.1921). However, the insurers have made no challenge on the grounds of 'interest' here
 
 
 [5]
 Other forms of anticipated profits insurance provide an insured amount which varies from month to month, as the insureds declare their expected profits, which generally depend on the state of the subcharter market. See, e.g., Continental Grain Co., Inc. v. Twitchell, (1945) 78 Lloyd's List L.R. 251 (C.A.). Still others provide for a pro-rated return of expected profit which will provide a different recovery depending on when, during the period of risk, the insured-against risk occurs. L. J. Buglass, Marine Insurance and General Average in the United States 288 (1973). Here, the parties chose to insure the total profit expected in one year and made no provisions for apportionment of actual loss
 
 
 [6]
 It is therefore irrelevant under the policy that the estimated domestic scrap value of the vessel in September 1964 was $28,875, or that she was shortly thereafter sold by the owners for just over $29,000
 
 
 [7]
 It is not clear how many (if any) subcharters plaintiffs had arranged at the time of delivery on November 19, 1963
 
 
 [8]
 The marine adjuster's handwritten notes read: 'Detention in Chesapeake Bay effecting telemotor repairs consequent on Repairer's Negligence--$635.00; Crew wages and provisions during detention--2 days--$332.78.'
 
 
 [9]
 Lenfest and Yarrington made a similar demand about a year later, on March 24, 1965
 
 
 [10]
 An average adjuster is an experienced professional in the field of marine insurance, who itemizes and classifies expenditures, damages and necessary repairs according to whether they are 'general' or 'particular' average items for purposes of determining insurer's liability and the liabilities of various interests one to the other. Buglass, supra, at 73. In the United States, the average adjuster is employed by the shipowner and paid by the underwriter, and his findings are 'seldom questioned.' Id
 
 
 [11]
 Not all items allowable in general average are allowable in the determination of constructive total loss. A 'general average act' is a sacrifice or expenditure voluntarily made to save ship or cargo from imminent total loss, whose costs are shared proportionally by those benefited. Gilmore & Black, supra, ch. 5. The key question in determining whether an item is includible in a calculation of a constructive total loss figure is whether or not the act related to the ship's repair. By way of contrast, a general average act need not be related to an effort to repair the vessel. Some costs generally are common to both, such as salvage expenses when unobligated third parties refloat or otherwise assist a vessel to shore for repairs. Buglass, supra, at 209. See also note 18, infra
 
 
 [12]
 The PANOCEAN's hull underwriters' proportion of the Port Everglades general average liability was $40,139.91, with special charges on the underwriters amounting to $5,090.16
 
 
 [13]
 These charges may be inferred from a telegram sent by John Wood, the average adjuster with Great Eastern Associates, to the London underwriters on March 4, 1965, and are supported by his more detailed handwritten notes in plaintiffs' exhibit 27
 Disbursements .. $11,097.76
 Survey fees .... $13,151.10
 Allowances ..... $10,095.42
 TOTAL ...... $34,344,28
 
 
 [14]
 The 'loss' referred to in the policies is that of a vessel. Plaintiffs' argument that they are entitled to recover for loss of profits alone is frivolous. Continental Grain Co. v. Christie, 22 N.Y.S.2d 57, 60 (S.Ct.1940)
 
 
 [15]
 See, e.g., Marine Insurance Act of 1906 §§ 55--63. English and American law of marine insurance have developed on rather similar lines. It is the general rule in this country, as the parties have agreed, that American courts will look to British law for meaning and definition in this field. Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co., 263 U.S. 487, 493, 44 S.Ct. 175, 68 L.Ed. 402 (1924); Calmar Steamship Corp. v. Scott, 345 U.S. 427, 442--43, 73 S.Ct. 739, 97 L.Ed. 1125 (1953). Although the Marine Insurance Act generally requires notice of abandonment for recovery on a constructive total loss, such notice is not an absolute prerequisite to recovery on anticipated profits for a constructive total loss where the insured is a charterer. Robertson v. Nomikos, (1933) A.C. 371; Roura & Fourgas v. Townsend, (1919) 1 K.B. 189. See also Canada Sugar Refining Co. v. Insurance Co. of North America, 175 U.S. 609, 619-20, 20 S.Ct. 239, 44 L.Ed.292 (1900); Buglass, supra, at 239, 44 L.Ed. 292 (1900); Buglass, supra, at
 
 
 [16]
 Since there is no indication in the record that the damage could have been properly or permanently repaired until Baltimore, the fact that the damage arose out of three different 'incidents' of insured-against perils is irrelevant. Cf. Patapsco Insurance Co. v. Southgate, 30 U.S. 604, 618--19, 8 L.Ed. 243 (1831)
 
 
 [17]
 The difficulties in reaching accurate estimates of what repair costs would have been is to some extent compensated by the practice of adding a 'contingency allowance' to the amounts calculated in determining constructive total loss. THE MEDINA PRINCESS, (1965) 1 Lloyd's List L.R. 361, 408; Irvin v. Hine, (1949) 83 Lloyd's List L.R. 162, 172--73
 
 
 [18]
 There is some confusion in this area, since the standards for determining whether crew wages may be included are different for general average costs than for determining constructive total loss; in this country, as in England, wages of crew while a vessel is being repaired have come to be considered general average costs. See York/Antwerp Rules 1/211; Buglass, supra, at 159. Under the rule's expanded definition of 'port of refuge' all the Baltimore crew expenses might well have been allowable as general average items
 
 
 [19]
 In Baltimore the deferred repairs were only $49,000; at New Orleans they were at the maximum $130,000; and at the end of September, the amount claimed as deferred was only $188,000. Thus, plaintiffs' cumulation theory requires aggregation of both deferred and accomplished repairs. Appellees have not challenged the correctness of cumulating actual and deferred expenses necessary at any single point in time
 
 
 [20]
 Although the rules of construction might tend to favor an interpretation in favor of the plaintiffs-insureds since the policy was prepared by the insurer, later amendment of the standard form insurance policies in 1970 specifically provides that the costs of recovery and repair must, indeed, arise out of a single incident to make a constructive total loss. It may be that, before the amendment, the industry thought that to be the rule in any event, before Mr. Justice Roskill raised the question in THE MEDINA PRINCESS, supra
 
 
 [21]
 Marine Insurance Act of 1906, § 77(1)
 
 
 [22]
 Although the baryte ore was loaded in Seville and apparently destined for New Orleans, on the record before us it would be difficult to describe the voyage as a 'single voyage,' though it may well have been intended to be continuous. We therefore do not consider the question whether, if we treated the PANOCEAN as having been on a single voyage all the way to the port of ultimate destination, New Orleans, we would allow cumulation of the costs after departure from Baltimore for New Orleans with the costs incurred at Baltimore
 
 
 [23]
 Stranding is generally considered a peril of the sea under a marine insurance policy, Lanasa Fruit Steamship Co. v. Universal Insurance Co., 302 U.S. 556, 561, 58 S.Ct. 371, 82 L.Ed. 422 (1938); Gilmore & Black, supra, § 2--9, unless due to scuttling. See Northwestern Mutual Life Ins. Co. v. Linard, 498 F.2d 556 (2 Cir. 1974)
 
 
 [24]
 These claims include the following: 1) between $40,000 and $51,000 in deferred hull repairs at New Orleans, 2) $45,230 salvage costs at Port Everglades, 3) $5,877 for repairs at Port Everglades, 4) engine repairs at New Orleans of $3,385, and 5) hull repairs of $5,771, totalling at most $111,263
 
 
 [25]
 Nor do we decide, since the issue was not tendered in this case, whether, even if the shipowner and underwriter negotiated on the basis of a constructive total loss, apportionment might not have to be made to exclude that portion of the settlement properly attributable to damage which occurred after the ship was off charter but during the policy term. We recognize that in a case where this question is properly raised arguments may be advanced by each party on this issue. On the one hand, the policy is one of 'full interest admitted'. On the other hand, once the ship was off charter, there was no anticipated profit for the charterer to recover and, hence, recovery for that period by the owner should not be considered on the claim of the charterer. We intimate no opinion on this question