557 F.2d 993
 Inez H. LENFEST and Marine Midland Grace Trust Company of
New York, as Executors of the Estate of Harold C.
Lenfest, and Kenneth F. Yarrington,
Plaintiffs-Appellees,
v.
Harold W. COLDWELL, Defendant-Appellant.
FERRO-BET CORPORATION OF AMERICA, Plaintiff-Appellee,
v.
Harold W. COLDWELL, Defendant-Appellant.
 No. 817, Docket 76-7581.
 United States Court of Appeals,
Second Circuit.
 Argued April 29, 1977.
Decided June 23, 1977.
 
 W. Shelby Coates, Jr., Wilbur E. Dow, Jr., New York City, for plaintiffs-appellees.
 Joseph D. Tarlowe, New York City, for plaintiff-appellee Ferro-Bet Corp. of America.
 William Warner, Symmers, Fish & Warner, New York City, for defendant-appellant.
 Before MULLIGAN and OAKES, Circuit Judges, and MISHLER, District Judge.*
 MULLIGAN, Circuit Judge:
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Southern District of New York, Hon. Robert L. Carter, entered after this court, upon appeal from a prior judgment in this case, remanded for further proceedings. Our earlier opinion, Lenfest v. Coldwell, 525 F.2d 717 (2d Cir. 1975), fully sets forth the factual background of this controversy and it will be repeated here only insofar as is necessary to a resolution of the issues currently before us.
 
 
 2
 Plaintiffs were the time charterer of the vessel S.S. Panocean from October 1963 until the summer of 1964 and the charterer's financiers. They were insured under an "Anticipated Profits" policy for $150,000 issued by a group of London marine insurers for whom Harold Coldwell serves as nominee in this action. Recovery under the policy was conditioned upon the Panocean becoming a) an actual total loss; b) an arranged or compromised total loss; or c) a constructive total loss as a result of marine or war perils, or crew negligence unless due to lack of due diligence by the owners or the insureds. The owners of the vessel had insurance policies on its hull and machinery for $240,000 and the costs of recovery and/or repairs to the ship would have to exceed that sum for the ship to become a constructive total loss.
 
 
 3
 The critical portion of the Panocean's voyage was its passage between Flushing, Netherlands and Baltimore, Maryland from February 24 to April 3, 1964. Damages and equipment losses resulting from insured-against marine perils forced the ship to put into Azores and Bermuda as ports of refuge before Baltimore could be reached for repairs. She was delayed there two months until June 5, 1964 at which time she was tendered back to the charterer as ready. Thereafter the ship suffered further breakdowns and damage, causing subcharterers to cancel and ultimately forcing an abandonment of the enterprise. Plaintiffs' claim under their policy spawned this ensuing litigation.
 
 
 4
 In his first decision, Judge Carter dismissed the plaintiffs' complaint since he found that the allowable expenses for repair of the Panocean aggregated only $211,459.71, which was below the required $240,000 figure. On appeal, this court canvassed each of the three contingencies which acted as conditions precedent to the plaintiffs' recovery. We concluded that there was no actual total loss since the vessel was afloat and capable of being repaired. 525 F.2d at 723-24. As for the other two, we remanded for further findings of fact and conclusions of law to determine whether a) the amounts paid by the insurers to the owners were in settlement of a constructive total loss claim, and b) whether allowable costs exceeded $240,000 resulting in a constructive total loss. The scope of the latter inquiry was restricted to events preceding and occurring at Baltimore. We held that costs incurred thereafter could not be cumulated with the earlier repairs. 525 F.2d at 726-27. Following the remand, Judge Carter held a further evidentiary hearing on April 6, 1976. In an opinion dated June 1, 1976, he concluded that the amounts received by the owners were not paid in settlement of a constructive total loss claim. However, his revised calculations of allowable expenses yielded alternate sums of $240,664.04 and $246,443.19 resulting in a constructive total loss.[1] On that basis, judgment for the plaintiffs was entered on July 26, 1976.
 
 
 5
 We agree with the district court that no arranged or compromised total loss was proven. In fact, the evidence established that no claim for constructive total loss was ever submitted.
 
 
 6
 On the issue of whether the total allowable expenses equal a constructive total loss, it becomes essential to determine if an allowance of $9,631.91 for crew wages at Baltimore was proper since allowable expenses exceeded the $240,000 amount by at most $6,443.19. Our prior opinion in this case fully sets forth the applicable legal principles governing the treatment of this expense, 525 F.2d at 725-26 (footnote omitted):
 
 
 7
 Generally, wages and crew maintenance are not allowable as items unless the crew assisted in or was "necessary in connection with the repair of the vessel." Compania Maritima Astra, S. A. v. Archdale (The ARMAR), (134 N.Y.S.2d 20, 32 (S.Ct.Sup.1954)); Hall v. Ocean Insurance Co., 38 Mass. (21 Pick.) 472, 480 (1839); Lord, The Hull Policy Actual and Constructive Total Loss and Abandonment, 41 Tulane L.Rev. 347, 353 (1967). See also THE MEDINA PRINCESS, ((1965) 1 Lloyd's List L.R. 361, 433). On the other hand, where the crew makes repairs or would have assisted in repairs, or where the crew is necessary to guard the vessel or to superintend the repair work, the expenses may properly be considered in determining whether there was a constructive total loss. Compania Maritima Astra, S. A. v. Archdale (The ARMAR), supra; Jeffcott v. Aetna Insurance Co., 40 F.Supp. 404 (S.D.N.Y.1941), aff'd, 129 F.2d 582 (2 Cir.), cert. denied, 317 U.S. 663, 63 S.Ct. 64, 87 L.Ed. 533 (1942).
 
 
 8
 With these considerations in mind, we remanded for "more detailed findings on what these costs were for, and particularly, how they relate to the repair of the vessel." Id. at 725 (emphasis added).
 
 
 9
 No such relation was found below. The court simply noted that the crew members of the Panocean were foreign residents, and that it would have been expensive to have discharged them upon arrival in Baltimore and then assemble another crew after repairs were completed. While that fact is not controverted, it does not justify shifting that expense to the underwriters absent some nexus with the repairs that the vessel underwent.[2]
 
 
 10
 Since plaintiffs claim that some part of crew wages was incurred in relation to the safekeeping and repair of the vessel, we remand solely for a further hearing on this issue.
 
 
 11
 Affirmed in part, reversed in part and remanded.
 
 
 
 *
 Hon. Jacob Mishler, Chief Judge, United States District Court, Eastern District of New York, sitting by designation
 
 
 [1]
 The difference between those two sums depends upon whether an item for crew wages, discussed infra, is allowed to the extent of 40% or 100%
 
 
 [2]
 Plaintiffs renew the contention, made to this court after the first argument but before the decision was rendered, that since a general average sacrifice may be recovered in full from underwriters who may then collect from other interests any contribution due by subrogation, the item for crew wages should be allowed in full. This argument ignores the distinction which our first opinion drew between general average and constructive total loss, and the different considerations which govern the recognition of an item under each classification. See 525 F.2d at 722 n.11 and 726 n.18