**SCAC TRANSPORT (USA) INC., Plaintiff,**

v.

**ATLANTIC MUTUAL INSURANCE CO., Defendant.**

No. 85 Civ. 8410 (JMW).

United States District Court, S.D. New York.

Jan. 15, 1987.

Cary R. Wiener, DeOrchis & Partners, New York City, for plaintiff.

Joseph J. Magrath, Bingham, Engler, Jones & Houston, New York City, for defendant.

## MEMORANDUM AND ORDER

WALKER, District Judge:

### INTRODUCTION

Plaintiff, SCAC Transport (USA) Inc. ("SCAC"), an ocean freight forwarder, brings this action to recover insurance proceeds from Defendant, Atlantic Mutual Insurance Co. ("Atlantic"). SCAC claims that Atlantic must pay for unrepaired partial damage to a cargo confiscated, subsequent to the damage, by Iranian Customs as SCAC unsuccessfully attempted to deliver it to Afganistan through an Iranian port during the turbulent years of the revolution in Iran, 1979 to 1981. The Court has jurisdiction over this claim under the Admiralty and Maritime claim provision of Rule 9(h) of the Federal Rules of Civil Procedure.

Atlantic has moved for summary judgment under Fed.R.Civ.P. Rule 56, claiming that SCAC may not recover under the insurance policy, notwithstanding the cargo's partial damage because Iran's subsequent confiscation of the cargo caused a total loss that was not covered by the insurance policy.[1] SCAC takes the opposite view.

For the reasons set forth below, defendant's motion for summary judgment is granted.

### FACTS

The facts material to this case are undisputed. In the summer of 1977, the United Nations Development Programme ("UNDP"), a subsidiary of the United Nations, engaged SCAC to forward road building machinery and supplies to UNDP Kabul, Afganistan through the Iranian port of Bandar Shaphour. SCAC's duties included preparing export documents, in-

---

1. Defendant's motion is procedurally defective since defendant has failed to file a statement of material facts not in dispute, as required by Rule 3(g) of the local rules of this Court. However, as the parties agree on the facts material to the issues presented in this motion for summary judgment, the Court declines to dismiss the motion based on this procedural shortcoming.

suring the cargo, and arranging overseas transport to Iran and overland transport from Iran to Afganistan. Under the contract the UNDP equipment was to be transported in three shipments.

## I. *The Insurance*

In fulfilling its obligations to UNDP, SCAC purchased from Atlantic two insurance policies for the cargo. One of these insured against "All Risks" and the other against "War Risks." The "All Risks" policy covered the cargo for the duration of the journey to Afganistan and insured it against the usual risks such as damage due to improper handling. This policy contained a "Free of Capture & Seizure Warranty" exclusion exempting Atlantic liability for losses resulting from "capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences of any attempt thereat, whether in time of peace or war and whether lawful or otherwise."

The "War Risks" policy, drafted in accordance with the American Institute of Underwriters form, covered war related calamities such as torpedo attack. This policy, however, not only excluded from coverage losses due to "comandeering, preemption, requisition or nationalization by the government (de facto or otherwise) of the country to or from which the goods are insured," but also ceased coverage as to all risks, except torpedo attack or mine damage, once the cargo was "discharged over side from an overseas Vessel at the final port of discharge." Hence, the "War Risks" insurance expired on each UNDP shipment upon discharge at the Iranian port of Bandar Shahpour.

## II. *The Events*

The history of the UNDP cargo's journey toward Afganistan via Iran is interwoven with the political upheaval in those nations during 1978 and 1979. On March 17 and April 21, 1978, the first two shipments arrived in Bandar Shahpour. On April 27, 1978, the regime in Afganistan was toppled by a Soviet-sponsored coup. The third shipment arrived in Bandar Shahpour on August 8, 1978, and in September 1978, the Shah declared martial law in Iran. By the end of 1978 none of the three shipments had cleared through Iranian customs.

In December 1978, Italteco, the Italian shipper engaged for the project by SCAC, reported that Iranian Customs, in writing, threatened to confiscate the equipment if it was not removed to its destination. One month later, in January 1979, the Shah departed Iran. In April 1978, Italteco reported to SCAC that it had persuaded Customs to refrain from confiscating the equipment "for another few months." In August of that year, an Italteco report stated that it was clearing the goods through Iranian customs. In November 1979, Iranian students seized the United States Embassy in Teheran.

Due to SCAC's inability to obtain information from its agents in Iran on the status of the shipments and the political turmoil there, SCAC concluded that the shipment was lost. On December 7, 1979, SCAC wrote to Atlantic:

> [W]e have no alternative but to consider from this date that there is a very strong presumption that the entire cargo has been lost; the United Nations, who have been kept thoroughly informed of the developments in this case, have formally requested that we initiate the necessary procedures to recoup their monies, based on a 100% loss.

Meanwhile in Afganistan, in September 1979, the pro-Soviet president had been ousted and killed; and on December 25, 1979, the Soviets invaded Afganistan.

In January 1980, SCAC apparently concluded that the cargo could be salvaged and continued its attempts to devise a suitable method for disposing of the cargo. On January 25, 1980, SCAC advised Italteco that UNDP was considering alternate destinations. In February and in March 1980, SCAC instructed Italteco to move the cargo from railroad cars to warehouses and reported that UNDP was still considering alternate destinations. Italteco replied that the only available storage facility was

the Iranian Customs warehouse. Later, Italteco reported that this facility could not be used to store the goods. On April 11, 1980, UNDP instructed SCAC to ship the goods to India, a decision confirmed in writing on April 16, 1980; but no action was taken on these instructions. At the end of April 1980, a surveyor indicated that the cargo had been damaged by bad stacking and vandalism, and that a detailed survey could not be undertaken without a crane.

The parties are agreed upon the foregoing facts. Atlantic, in addition, alleges additional facts, not material to the Court's decision on this motion, that are neither denied nor affirmed by SCAC. The gist of these allegations is that no one has ever ascertained the extent of the damage sustained in Bandar Shahpour with any degree of certainty. In addition, Atlantic says that UNDP and SCAC halted shipment to India after deciding again to attempt to shipment to Kabul. Finally, Atlantic says, in May 1980, SCAC told Italteco to leave the goods in Bandar Shahpour pending a detailed survey of the cargo's damage. According to Atlantic, the goods languished in Iran when UNDP refused to authorize transport until after a survey and then refused to advance the money necessary to survey the cargo. Atlantic claims that SCAC ultimately permitted Italteco to transport the cargo to Mashad, Iran, where they were confiscated 18 months later.

Whatever occurred after May 1980, the parties have stipulated that in or about December 1981, the Iranian Customs Authority confiscated the three shipments of equipment.

### DISCUSSION

#### I. *SCAC's Claim for Partial Loss*

Both sides agree that confiscation by Iranian Customs was an uninsured risk and because confiscation falls within the "Free of Capture & Seizure Warranty" exception to the "All Risks" policy and because the "War Risks" policy expired upon the cargo's discharge at Bandar Shahpour. Thus the sole issue, albeit unascertained (and probably unascertainable), is whether

SCAC may recover for the partial unrepaired damage reported by the surveyor in April 1980, prior to the total loss of the cargo to an uninsured risk in December 1981.

It is not disputed that, absent the fact of the confiscation of the cargo by Iranian customs, Atlantic would be liable for the partial covered losses under the "All Risks" policy. SCAC argues that since this is so, it is of no consequence that the partial loss was followed by an uncovered loss, as it is the general rule that an insurance policy is an agreement to pay money upon the occurrence of an event, and therefore, the right to payment arises automatically upon the occurrence. *Pape, Williams Co. v. Home Insurance Co.*, 139 F.2d 231, 234 (2d Cir.1943). SCAC also points to cases in which the insurance contract specifically excluded liability for unrepaired partial losses preceeding a total loss and argues that these cases are authority for the proposition that the risk of loss due to multiple accidents should be dealt with by contract rather than by court rule. *See Gulf Florida Terminal Co. v. Interstate Fire & Casualty Co.*, 423 F.2d 269, 1970 A.M.C. 28 (5th Cir.1970). The Court cannot accept the plaintiff's position.

The situation in which goods are partially damaged by an insured risk, are not repaired, and then are wholly lost due to an uninsured risk is a novel one. No state or federal case from this country has been cited to the Court, and the Court has found none that addresses this issue. The Court, however, is assisted by two English cases: *Livie v. Janson*, 12 East. 648 (1810), and *British and Foreign Insurance Co., Ltd. v. Shipping Co., Ltd.*, I.A.C. 188 (H.C. 1921).

In *Livie v. Janson*, 12 East. 648 (K.B. 1810), a ship insured for voyage from New York to London was "warranted free from American condemnation." Attempting to evade the American embargo, the ship tried to leave New York harbor at night, but, floating ice drove it onto rocks at Governor's island. The next morning American

authorities seized and condemned the ship and its cargo. Lord Ellenborough rejected the insured's claim for a total loss as being caused by the expressly excluded risk of "American condemnation." He then denied the claim for the sea damage to the vessel and its cargo caused by the accident, an insured risk, because the ship, whether damaged or not, would in any event have been lost to the insured. Lord Ellenborough reasoned, "if the property, whether damaged or undamaged, would have been equally taken away from him, and the whole loss would have fallen upon him had the property been ever so entire, how can he be said to have been injured by its having been antecedently damaged?" *Id.* at 654. Lord Ellenborough reached this result despite the plaintiff's allegations that the confiscation occurred precisely because the ship had been driven into rocks and damaged.

In *British and Foreign Insurance Co., Ltd. v. Wilson Shipping Co., Ltd.*, 1 A.C. 188 (H.L. 1921), the owner of a ship under charter to the Admiralty had contracted for private insurance against marine risks, while the Admiralty agreed to pay for war loss. The vessel was damaged by marine risks on three separate occasions. The owner undertook some temporary repair of the vessel and the underwriters reimbursed him for this sum. Four months later, the ship was torpedoed and lost. When the Admiralty reimbursed the owner for the full value of the ship, less the value of the repairs which the owner had not undertaken, the owner brought suit for the cost of finishing the repairs on the ship. The House of Lords, relying on *Livie v. Janson*, denied recovery for the unrepaired damage, holding that the owner had lost the entire value of the ship due to the torpedo—and that the smaller, earlier loss had "merged" into the ultimate loss. Therefore, the underwriters were not liable for the unrepaired damage.

These English cases are not without substantial presidential value. This Court is mindful that the Supreme Court has indicated the desirability of keeping American law "in harmony" with English law in the field of marine insurance. *Queen Insurance Co. v. Globe Insurance Co.*, 263 U.S. 487, 493, 44 S.Ct. 175, 176–77, 68 L.Ed. 402 (1924); *See Also, Lenfest v. Coldwell*, 525 F.2d 717, 724 n. 15 (2d Cir.1975) ("It is the general rule in the country, as the parties have agreed, that American courts will look to British law for meaning and definition in this field").[2]

■ American cases which have considered the allocation of loss in situations of multiple successive injuries to a ship or cargo also weigh in Atlantic's favor. For instance, when a cargo or ship suffers a partial loss covered by insurance, and later the ship or cargo is totally lost due to a risk also covered by the insurance, sums resulting from the partial loss cannot be recovered in addition to the value of the total loss unless the insured has expended money on repairs. This result prevents a windfall recovery to the insured who is able to reclaim the total value of the shipment lost, and who has suffered no additional out-of-pocket repair costs. *See Lenfest v. Coldwell*, 525 F.2d 717, 727 (2d Cir.1975). If, however, the insured has expended sums on repairs prior to the total loss this extra out-of-pocket loss is recoverable even though the sum plus the total loss recovery exceeds the original value insured under the policy. *Potter v. Providence Washington Insurance Co.*, 4 Mason 298, 19 F.Cas. 1180, 1181 (1st Cir.1826) (No. 11,-336); *Matheson v. Equitable Marine Insurance Co.*, 118 Mass. 209 (1875); 2 *Couch on Insurance 2d* § 55,33 (Rev.Ed. 1984).

■ The Court is persuaded that the reasoning in *Livie v. Janson* should apply in the instant case. Plaintiff SCAC has lost the entire value of its cargo due to the

---

**2.** *Livie v. Janson* has been cited as the rule of law in the United States in *J & H Schieffelin v. New York Insurance Co.*, 9 Johns. 651, 653 (N.Y. Sup.Ct.1812). As the case is over 150 years old

and the reference to *Livie v. Janson* is in dictum, the Court finds that, while the case provides valuable guidance, it cannot be considered binding precedent.

uninsured loss of confiscation. Whether or not the partial damage had occurred, Iranian confiscation would still have resulted in the total, uninsured, loss of the cargo. SCAC advanced no funds toward the repairing of the partial insured damages. Therefore, SCAC suffered not at all from the its occurrence. To allow SCAC to recover here would, thus, be to award a windfall recovery to a plaintiff whose loss resulted from an uninsured risk. As Lord Ellenborough reasoned in *Livie v. Janson*, "we are not to be seeking about for odds and ends of previous partial losses, when at last, there was an overwhelming cause of loss which swallowed up the whole subject matter." 12 East at 656.

Had SCAC made an adequately supported allegation that it suffered some direct monetary loss as a result of the partial damage, a factual issue requiring a trial on the merits might be raised. SCAC has not done so beyond a conclusory allegation, in support of its claim for a total constructive loss, that the reason the cargo never left Iran and was confiscated was due both to political upheaval and the damage it had sustained. This does not provide an issue of fact requiring a trial on the merits. *Blaine Richards and Co. v. Marine Indem. Ins. Co.*, 635 F.2d 1051, 1055 (2d Cir.1980) (Although United States Customs detained cargo of beans because it had been damaged by an improper fumigant, the court found that the loss of the cargo resulted from the excluded risk of detention, not the earlier physical damage it had sustained). Nor has SCAC made any allegation that Atlantic has somehow behaved culpably so as to injure SCAC's interests in the cargo. Accordingly, in the circumstances of this case, where there is no indication that the insurance company has behaved culpabably or that plaintiff has suffered a direct economic loss as a result of the partial damage, the Court finds that SCAC cannot recover for the partial damage to the cargo.

## II. *Constructive Loss*

SCAC also argues that well before the December, 1981 seizure by Iranian Cus-

toms, in its letter of December 7, 1980, SCAC stated that the cargo was "constructively lost" due to the high probability of an actual total loss. The Court is not persuaded that this argument raises any genuine issue of material fact requiring a trial on the merits.

Where the circumstances which threaten the cargo and make transshipment impossible, here the political upheavals in Iran and Afganistan and the threats of confiscation by Iran, are specifically excluded from coverage under the insurance policy, they can no more justify an award for a constructive total loss of the cargo than they could an award for the actual total loss of the cargo. *Richelieu & Ontario Navigation Co. v. Boston Marine Insurance Co.*, 136 U.S. 408, 431, 10 S.Ct. 934, 940-41, 34 L.Ed. 398 (1890); 2 *Couch on Insurance 2d* § 55:208 (rev ed 1984). Second, it is undisputed that after sending the December 7, 1979 letter, SCAC and UNDP continued to exercise control over the cargo, sending Italteco instructions to remove the cargo to warehouses and identifying possible alternate destinations for the cargo. This retention of control over the cargo indicates that SCAC did not abandon the cargo to the insurer. Although abandonment is not required to support a claim of constructive total loss when it would be a "futile act or an idle ceremony," there is no evidence that this is true here. *See Rock Transport Properties Corp. v. Hartford Fire Insurance Co.*, 312 F.Supp. 341 (S.D.N.Y.), *aff'd*, 433 F.2d 152 (2d Cir. 1970).

## CONCLUSION

SCAC suffered a total loss by an excluded peril when the insured cargo was confiscated by Iranian Customs in December 1981. This event and not the prior partial loss caused SCAC's loss. Therefore, Atlantic's motion for summary judgment dismissing the complaint is granted. The Court, however, wishes to emphasize that its holding is limited to the facts of this case, where there is no showing of culpable

behavior by the defendant insurance company or that the plaintiff suffered a direct economic loss due to the partial damage.

SO ORDERED.